AMERICAN HOME ASSURANCE
COMPANY, Plaintiff,

v.

William S. EVANS, and Katherine D. Evans, Husband and Wife, Jointly and Severally, and Philip Green, Partial Conservator of the Estate of Dr. C. Merle Dixon, Defendants.

Civ. A. No. 82–60306.

United States District Court,
E.D. Michigan, S.D.

June 12, 1984.

**1278**

Stanley Prokop, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for plaintiff.

Parvin C. Lee, Jr., Pontiac, Mich., Robert J. Harris, Harris, Lax, Gregg & Guenzel, Charles W. Borgsdorf, Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This matter is before the court on four motions for partial summary judgment filed by the defendant Green, who is the conservator of the estate of Dr. Dixon. The first motion seeks partial summary judgment that the plaintiff American Home is estopped from invoking the dishonesty exclusion of the policy and the pecuniary limits due to its failure to provide Green with a copy of the insurance policy. The second motion seeks the same relief based upon American Home's alleged failure to provide its insured William Evans with independent counsel in the state malpractice action styled *Green v. Evans*. The third motion seeks partial summary judgment that the application of the dishonesty exclusion and the pecuniary limits to the facts determined in *Green v. Evans*, as to which the plaintiff is collaterally estopped from refuting, leads to the conclusion that American Home is liable to Green for $400,000 plus interest. The last motion seeks partial summary judgment that American Home is estopped from raising the defense of failure to disclose possible claims against the insured in applying for the policy because American Home delayed in notifying Evans of this possible defense to coverage.

## FACTS

This is an action for declaratory judgment brought by American Home Assurance Company seeking a determination that there was no insurance coverage under any of the policies insuring William Evans for the claims made in the state action of *Green v. Evans*, Civil Action No. 81-21259-CZ (hereinafter "state action"). The defendant Philip Green has counterclaimed in three counts seeking judgment against American Home for $698,981.00 plus interest.

Mr. Evans is an attorney and was insured for malpractice by American Home for the policy years 1975–76 and 1976–77. The policies provided an occurrence limit of $100,000 and a maximum aggregate coverage of $300,000 for each policy year. Mr. Evans handled certain transactions for Dr. Dixon occurring in the period 1975–77 and these transactions were the basis for the state malpractice action against Mr. Evans and his wife Katherine. The action was brought by Philip Green who was appointed conservator due to the ill health of Dr. Dixon.

The complaint in the state action was filed July 1, 1981. It was American Home's position, based upon the allegations in the original complaint, that there was no insurance coverage and, therefore, American Home refused to defend Evans. It maintained this position until the second amended complaint was filed in January of 1982 alleging negligence. On February 12, 1982, American Home wrote Evans' personal counsel that it had hired a firm to defend Evans "under a reservation of rights to withdraw from the case at such time that we make a determination regarding our indemnification and defense obligations." The letter also informed Evans' counsel that American Home had hired a certain law firm to investigate the coverage issue. After receiving this information, Evans' personal counsel sought and obtained an eight month adjournment of the trial date until November 8, 1982. Counsel provided by American Home then took over the defense of the action.

In October of 1982, American Home filed this declaratory judgment action and petitioned the state court to have the malprac-

tice action stayed pending the resolution of the coverage issue. Green filed a motion with this court to stay this case pending the trial in the state action which was scheduled for November 8. Green's motion was granted in part and the state action proceeded with the jury awarding the plaintiff $698,981.00 plus interest.

■ Discovery in this case has been completed and the matter is ready for trial. Green is the judgment creditor, having prevailed in the state action, and has filed these various motions in an attempt to limit the issues to be tried. Since the judgment in the state action, Evans has assigned all of his rights under the insurance policy to Green. As judgment creditor and assignee, Green has standing to raise the issues addressed in these motions.

## MOTIONS TO ESTOP AMERICAN HOME FROM RAISING POLICY EXCLUSIONS AND PECUNIARY LIMITS

The first and second motions seek to estop American Home from raising the dishonesty exclusion and the pecuniary limits of the policies in question due to the alleged wrongful conduct of American Home in connection with the state proceedings.

The argument is basically that Evans, and consequently Green, have been injured by the conduct of American Home in not providing a copy of the insurance policy and in not providing independent counsel. Green, in trying to collect the amount of the state judgment from American Home, is faced with the insurmountable task of proving coverage for a general verdict that includes $300,000 in exemplary damages and that does not allocate the damage award among years or occurrences. It is Green's position that if American Home had provided copies of the policies in question and that if it had provided independent counsel, some of the difficulties could have been avoided through special interrogatories to the jury. Green believes that American Home should not profit from its alleged wrongdoing and, therefore, should be estopped from raising the defenses of pecu-

niary limits and the policy exclusion for dishonest conduct.

■ It is important to note that all of the motions are for summary judgment. Green carries a heavy burden of demonstrating that there are no material issues of fact in dispute and that, on the facts available, he should prevail as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Felix v. Young*, 536 F.2d 1126 (6th Cir.1976).

There is a dispute as to whether American Home had copies of the policies in its New York office. This dispute tends to obscure more than illuminate the relevant facts on the issue of whether American Home should be penalized for failing to provide copies of the insurance policies. Green first tried to obtain copies of the policies in November of 1981 when he noticed the deposition of Evans. In the notice Evans was instructed to bring copies of any insurance policies he had covering the period of 1975–81. Apparently, counsel for Green attended three scheduled depositions of Evans during November and December of 1981 but Evans failed to bring copies of the policies on each occasion. Shortly thereafter, Green filed a motion to compel production of documents in the state action seeking the policies. The motion was granted and Evans was ordered to produce the policies. He was ordered again at the pre-trial conference to produce any outstanding discovery material in advance of April 23, 1982. The policies were not produced in advance of the state trial. On December 29, 1982, Green served American Home with a formal request to produce the policies in this action. American Home responded that it did not have the originals of the policies but could only reconstruct samples. Eventually, copies of the policies were obtained from Evans when American Home's attorney adjourned his deposition briefly so that Evans could return home to get the policies.

■ Even under the facts as recited by Green in support of the motion, it is clear

that there was no formal request made to American Home for copies of the policies prior to the completion of the trial in the state action. The requests were directed at Evans. Furthermore, the initial requests were made before American Home retained counsel to defend Evans. Under the circumstances, it is hard to see any basis for penalizing American Home on this ground.

The second allegation is that American Home did not provide independent counsel for its insured Evans. The record is clear that counsel hired by American Home to defend Evans viewed his representation as dual. Counsel was deposed in connection with this action and a careful reading of his deposition demonstrates that he believed he represented *both* American Home and Mr. Evans. Furthermore, when asked questions regarding communications to employees of American Home, he asserted the attorney-client privilege first on behalf of Evans and then, when Evans waived the privilege, asserted it on behalf of American Home.

In this case American Home was certainly aware of the significant conflicts between it and its insured. Initially, American Home refused to defend Evans because it interpreted the charges against him in *Green v. Evans* as charges of fraud and, therefore, not covered by the policy. When American Home finally entered the case, it did so under a reservation of rights and even retained its own counsel to investigate the coverage issue.

There is also evidence in this case that information passed from counsel hired to defend Evans to counsel hired to investigate the coverage issue. The information did not pass directly but merged and was transmitted among employees of American Home. The record shows that there was communication from Evans' counsel to Mr. Cunningham of American Home and that the information was transmitted from Mr. Cunningham to Mr. Ritter of American Home. Mr. Ritter was assigned to the coverage issue and communicated with counsel retained for this problem. There is, however, no evidence that any of the

information which passed in this manner concerned possible defenses that the insurer could use in the coverage action.

Lastly, there is evidence that the firm hired to defend Evans was frequently hired by American Home to defend its insureds in cases involving no conflict of interest. Green argues that the firm had certain loyalty to the insurer because of this established relationship.

Green does not argue that counsel hired to defend Evans did anything improper or unethical in defending Evans. The allegation is rather that counsel was not independent and that this fact influenced the manner in which the defense was conducted.

Green believes that, had counsel been truly independent, he would have requested a special verdict that would have solved the problem of allocation of damages among occurrences and policy years and the problem of whether the actions of Evans were negligent or fraudulent. It is Green's position that the insured was prejudiced in this respect because he did not have independent counsel and, therefore, the insurer should be estopped from raising the defenses of pecuniary limits and policy exclusions because of its wrongful conduct in providing dual representation.

■ There appears to be no dispute that Michigan law applies to the claims made in this case. There are no Michigan cases directly on point, so it will be necessary to look to cases in other jurisdictions, analogous Michigan cases, and secondary authority to determine how the issue might be solved by Michigan courts.

■ Estoppel has been used in cases where the insured committed wrongful acts in connection with its duty to defend under an insurance policy. For example, in *Employers Casualty Co. v. Tilly*, 496 S.W.2d 552 (Tex.1973), the court held that the insurer was estopped from using evidence that it had gathered from the attorney hired to defend the insured. In *Tilly* the insurer had retained counsel under a reservation of rights which asserted late notice as the basis for possible lack of coverage.

The insurer then instructed counsel hired to defend the insured to investigate this issue and develop any evidence relative to the time of notice.

In *Parsons v. Continental National American Group*, 113 Ariz. 223, 550 P.2d 94 (1976), the insurer had provided counsel and had not issued a reservation of rights letter, since there was no basis for disputing coverage at that point. Counsel investigated the case and notified the insurer of a possible basis for denying coverage. The insurer then issued a reservation of rights letter. The court held that the insurer was estopped from using this defense to coverage.

In discussing both of these cases, A. Windt, in his treatise *Insurance Claims and Disputes* § 4.40 (McGraw-Hill 1982), says that before estoppel should be applied against the insurer there should be some evidence of wrongdoing on the part of the insurer separate from the acts of counsel. Windt argues that both cases were correctly decided because in *Tilly* the insurer had specifically instructed counsel to seek evidence that would help it contest coverage and in *Parsons* the insurer accepted information subsequent to the initial disclosure when it should have instructed the attorney to cease the unethical conduct.

In both *Parsons* and *Tilly* there was a direct connection between the wrongdoing of the insurer and the estoppel remedy. In both situations the insurer was estopped from using information wrongfully obtained. The prejudice to the insured was clear in both cases.

■ Equitable estoppel is appropriate where one party has been misled to his prejudice and has acted in reliance upon the conduct calculated to mislead. See *Cinderella Co. v. United Detroit Co.*, 367 Mich. 424, 116 N.W.2d 825 (1962). An estoppel cannot arise absent prejudice to the person claiming it, *Tobias v. Tobias*, 345 Mich. 263, 75 N.W.2d 802 (1956); *see also, Stewart v. Eldred*, 349 Mich. 28, 32, 84 N.W.2d 496 (1957).

■ While the court is persuaded that counsel provided by the insurer was not independent, it is not persuaded, based on the present record, that the elements required for an estoppel remedy are established. The arguments concerning prejudice are speculative at best. First of all, there is no claim of actual wrongdoing on the part of counsel retained to defend the insured. The claim is rather that the representation was inadequate or not sufficiently zealous because of dual loyalties. The examples provided to support this contention are unpersuasive.

As a preliminary matter, Michigan expressly prohibits the joining of insurance coverage matters in personal injury actions:

Sec. 3030. In the original action brought by the injured person, or his or her personal representative in case death results from the accident, as mentioned in section 3006, the insurer shall not be made or joined as a party defendant, nor shall any reference whatever be made to such insurer or to the question of carrying such insurance during the course of trial.

Mich.Comp.Laws Ann. § 500.3030 (West 1983). While this section applies to personal injury actions and the court has been unable to find an instance where the statute has been applied to a malpractice action, the presence of the statute makes it unlikely that a Michigan court would be willing to complicate a liability trial with insurance issues.

With respect to the failure to resolve the applicability of the dishonesty exclusion in the state action, the instructions given in that case primarily concern negligence, malpractice, and undue influence and include various provisions of the Code of Professional Responsibility. There is no instruction defining fraud for the purpose of assigning liability. There is one instruction concerning exemplary damages in which the jury is told that such damages might be awarded for conduct exhibiting gross negligence or worse. It is difficult to see how Evans was prejudiced by the

failure of his attorney to insist that the jury decide whether the conduct was negligent or fraudulent, since the general thrust of the instructions is in the direction of negligence. The verdict form phrases liability in terms of professional negligence. If the attorney believed that there was no fraud and had insisted that the jury be given this option for liability, his action would be quite questionable. On the other hand, if he thought that there was fraud and had asked for instructions in this regard, one might well wonder if he was acting in the interest of the insured or of the insurance company. Any prejudice to the insured alleged to have resulted from the conduct of counsel in this respect is speculative at best.

The form of verdict is dictated in part by the claims made by the plaintiff. The plaintiff in *Green v. Evans* sought exemplary damages and it is this portion of the award that is ambiguous. Compensatory damages were awarded for "professional negligence" which, on its face and absent possible defenses by the insurer, appears to be within the general coverage of the policy. Consequently, there is no reason to apply the doctrine of equitable estoppel to prevent the insurer from raising the dishonesty exclusion in defense of coverage, on the ground that counsel failed to request a special verdict on the issue of whether there was negligence or fraud.

The second argument is that independent counsel would have sought special interrogatories to resolve the problem of policy limits. The policies for each year in question carried a $100,000 limit per occurrence and a $300,000 limit per year. The problem here is that the jury awarded a lump sum for compensatory damages and another lump sum for exemplary damages.

The parties agree that the acts in question took place over a two year period. However, they disagree over whether there was more than one occurrence. American Home argues that the maximum coverage possible is $100,000 for one occurrence; the defendant argues that there were several occurrences, making the $100,000 occur-

rence limit irrelevant. The court has reviewed the record and holds as a matter of law that there was more than one occurrence. The policy defines the occurrence limit as follows:

The limit of liability stated in the declaration as applicable to "each claim" is the total limit of the company's liability for all damages arising out of all acts or omissions in connection with the same professional service regardless of the number of claims or claimants. Subject to the foregoing provisions respecting each claim, the limit of liability stated in the declarations as "aggregate" is the total limit of the company's liability hereunder for all damages.... If the policy period is longer than one year, the aggregate limit applies separately to each annual period.

The Court of Appeals has recently held that the number of occurrences for purposes of applying coverage limitations is properly determined by reference to the cause of damage rather than the number of injuries or claims. *Michigan Chemical Corp., et al. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir.1984). Consequently, under the terms of the policy the relevant question is the number of professional services rendered by Mr. Evans for the two year period involved.

Mr. Evans negotiated a deal on behalf of Dr. Dixon with the gravel company which was removing gravel from Dr. Dixon's farm. He negotiated the sale of the farm to himself. He set up a trust for Dr. Dixon over which he was trustee and made ten withdrawals during the period in question. The trust, the sale of the farm, and the gravel deal each took place in the first year and each represents a separate professional service. Consequently, there were at least three professional services in the first year, each carrying a pecuniary limit of $100,000 under the policy with a possible aggregate limit of $300,000 for the 1975–76 policy year.

The record shows that there was one withdrawal from the trust in the policy year 1976–77. The court believes that this

withdrawal was part of the professional service rendered in connection with the trust and is part of that one occurrence. Consequently, under the terms of the policy the maximum coverage for the alleged negligence in administering the trust is $100,000. This limit applies whether all the damages were incurred in the first year or whether the damages were incurred over the two-year period.

Nevertheless, having resolved this issue, considerable allocation problems remain. The jury awarded a lump sum of $398,981 for compensatory damages and $300,000 for exemplary damages. There is no way of knowing which transactions accounted for the damage award or how much of the award is attributable to a specific occurrence. For example, if the jury awarded $250,000 compensatory damages for the sale of the farm, only $100,000 of this award would be covered under the occurrence limit.

■ The form verdict in the *Green v. Evans* action contained ten questions relating to the issue of liability and damages. While it is possible that independent counsel would have asked for questions designed to deal with the allocation problem, it is not altogether probable that the trial judge would have been willing to frame additional questions to solve an insurance problem not before him. As discussed earlier, before estoppel can be asserted there must be an intent to mislead, reliance, and prejudice. The relationship between the conduct of the insurer and the prejudice claimed is too tenuous to warrant the application of equitable estoppel. Furthermore, it is doubtful that estoppel should be used to increase liability beyond the policy limits absent a clear showing that the acts of the insurer led the insured to believe that there was coverage. *Windt, supra* at § 6.29.

There is no allegation that Evans was led to believe that he would be covered by the policy for any damages which might be awarded in *Green v. Evans*.

Lastly, Green argues that settlement possibilities were prejudiced by the presence of counsel with dual loyalties. This, again, is speculation. Furthermore, there is evidence that Evans refused any settlement offers that included a provision requiring him to give up the farm. The return of the farm was the most important aspect of this case to Dr. Dixon.

Green has failed to establish, based upon the record of undisputed facts, the elements necessary for the application of equitable estoppel with respect to the dishonesty exclusion or the pecuniary limits claimed by the insurer in defense to coverage. Consequently, the court is unable to hold as a matter of law that the insurer is estopped from raising these defenses based upon the present record. Therefore, the motions for partial summary judgment that the plaintiff is estopped from raising the dishonesty exclusion and the policy limits as a defense to coverage are denied.

## MOTION FOR PARTIAL SUMMARY JUDGMENT ON COLLATERAL ESTOPPEL GROUNDS

The third motion seeks partial summary judgment that the application of the dishonesty exclusion and the pecuniary limits to the facts determined in *Green v. Evans*, as to which the plaintiff is collaterally estopped from refuting, leads to the conclusion that American Home is liable to Green for $400,000 plus interest.[1]

This motion argues that 1) American Home is collaterally estopped from relitigating issues determined in the prior action, and 2) that the burden of proof on the coverage question should be shifted from

---

1. The $400,000 figure is based upon the argument that the withdrawal from the trust which took place in the 1976–77 policy year represents a separate professional service which carries a claim limit of $100,000 for that year. The court has already ruled that this withdrawal was part of the trust service and as such is not a separate occurrence.

The court has also ruled that there were at least three occurrences in the first year. Assuming that there were only three occurrences in the 1975–76 policy year and assuming that allocation is not possible, the maximum coverage under the policies is $300,000, absent further defenses by the insurer.

Green to American Home due to the failure to provide independent counsel in the state action.

■ The normal rule is that collateral estoppel applies if 1) the insurer had notice of the claim, and 2) had the opportunity to defend or actually defended in the action. Restatement Second of Judgments § 58;[2] *Windt, supra* at § 6.19. The Restatement goes on to say that the insurer is estopped from relitigating issues determined in the liability action for which there was no conflict of interest between the insured and the insurer. The Restatement defines "conflict of interest" as arising when the claim against the insured is such that it could be sustained on different grounds, one of which is within the insurer's obligation to indemnify and another which is not. Consequently, under the Restatement rule, the insurer would not be collaterally estopped from litigating issues for which there was a conflict in a second action involving coverage questions.

■ In the present case there is no dispute that the insurer was given notice of the claim, an opportunity to defend, and that it eventually did provide defense of the action. Under the circumstances, collateral estoppel applies to the insurer. There are California cases which hold that collateral estoppel does not apply to the insurer where the insurer defends under a reservation of rights. *See, e.g., Gray v. Zurich Ins. Co.,* 65 Cal.2d 263, 419 P.2d 168 (1966). This rule is overbroad because it enables the insurer to control the defense but have a second opportunity to litigate the result— all at the expense of the insured.

The court is persuaded that the Restatement rule is the most appropriate. Under that rule collateral estoppel would apply to the insurer in this action. The general rule is that "the conclusiveness of a judgment as against a person liable over to the judgment debtor extends to facts established or necessarily adjudicated in the first action, insofar as the issues litigated therein are identical with the issues involved in the subsequent action." 46 Am.Jur.2d § 561.

■ The remaining question is the extent of application. The Restatement excludes issues for which there is a conflict of interest between the insurer and the insured. This rule is appropriate where the insurer has issued a reservation of rights and where it has provided independent counsel. Under such circumstances, it would be grossly unfair to collaterally estop the insurer from litigating coverage issues relating to areas of conflict of interest as defined in the Restatement.

The Restatement does not address the difficult situation in which the insurer provides counsel with dual loyalties. As discussed earlier, the record in this case establishes that counsel provided by American Home to defend Evans in the state liability action was not independent counsel. Counsel's deposition demonstrates that he believed that he represented both American Home and Evans[3] and that he declined to

2. § 58. Effect of Judgment Against Indemnitee on Indemnitor Who Has Independent Duty to Defend Indemnitee

(1) When an indemnitor has an obligation to indemnify an indemnitee (such as an insured) against liability to third persons and also to provide the indemnitee with a defense of actions involving claims that might be within the scope of the indemnity obligation, and an action is brought against the indemnitee involving such a claim and the indemnitor is given reasonable notice of the action and an opportunity to assume its defense, a judgment for the injured person has the following effects on the indemnitor in a subsequent action by the indemnitee for indemnification:

(a) The indemnitor is estopped from disputing the existence and extent of the indemnitee's liability to the injured person; and

(b) The indemnitor is precluded from relitigating those issues determined in the action against the indemnitee as to which there was no conflict of interest between the indemnitor and the indemnitee.

(2) A "conflict of interest" for purposes of this Section exists when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the indemnitor's obligation to indemnify and another of which is not.

Restatement (Second) of Judgments § 58 (1982).

3. Q. Take it you're not invoking attorney-client privilege to our marking them [letters

discuss matters with Evans for which he thought there might be a conflict.[4] It is

to Cunningham at American Home] as deposition exhibits and putting them in this record?
A. The privilege exists between this office and American Home Assurance Company, and yes, I would invoke, absent a waiver from American Home Insurance Company.
Q. Because American Home was your client and these were attorney-client communications?
A. Both Mr. Evans and American Home.
Q. Obviously Mr. Evans waived his privilege. Are you saying unless and until American Home will waive its privilege you will not testify to the content of these further?
A. Absent a waiver from American Home, I could not.

Farrell deposition at 36.

4. Q. ... Why don't you tell me what you recall was the understanding between you and Mr. Evans as to what you could and could not talk to American Home about with reference to the policy limits? ... Would, excuse me; I mean would, please?
WITNESS: I advise him that I would not discuss, I would not advise either he or American Home on whether or not there was coverage at all, or how much coverage should be in my opinion applicable to it. That would destroy our entire relationship. I discussed with him what position I had been informed from the beginning American Home had taken. I think there was a letter or something saying they were rendering defense under a specific policy and the limit was one hundred, three hundred.

Farrell deposition at 29.

....

Q. Question I am going to is: did you counsel with Mr. Evans about a strategy that would enable him, if he should lose Green v. Evans, to come out as best he could in the declaratory judgment action?
A. No.
Q. Never discussed that with him at all?
A. No. That is true, I did not.
Q. You never discussed, I take it, how a special verdict might be used to find some fact that would bear upon coverage?
A. No, I did not.
Q. Never discussed the possibility of getting the carrier into the same suit in which Mr. Evans was being sued?
A. I did not.
Q. Was it your undertsanding that Mr. Golob was discussing these things with him?
A. Mr. Golob was representing Mr. Evans and personally advised him on his dispute with American Home; and representing him.
Q. Because Mr. Golob discussed this with you?
A. I remember him discussing his knowledge of the carrier's obligations at the pre-trial with Judge Montgomery, or more than one. I believe there is a copy of correspondence he

sent to American Home again citing their obligations. That is my knowledge.
Q. There is no question he was trying to get the carrier to defend and indeed drop its reservations?
A. Yes.
Q. I am going beyond that question. I think that is clearly his role, no one could dispute that. My question is whether he and you discussed specific tactical moves to be pursued by you in Green [v.] Evans so if Mr. Evans should lose in Green v. Evans he would be in the best possible position to win in the declaratory judgment suit; did you and Golob discuss that?
A. No.
Q. You never attempted to counsel Mr. Evans?
A. I did not.
Q. You controlled all the details of how the case would be tried?
A. With discussions with Mr. Evans, yes.
Q. Yes. And Mr. Evans in his discussions with you never raised the subject of let's make sure we do this in such a way that if I lose in this case I win in the declaratory judgment?
A. No, he did not raise that.
Q. ... Did he give any sign to you, he being Mr. Evans, that he was thinking in terms of pursuing the strategy in Green v. Evans which would leave him in the best shape in the declaratory judgment action should he lose in Green v. Evans?
A. I can't be more—
Q. He never talked to you about say, what are we doing in terms of a special verdict so we might find some of these coverage facts in this case?
A. No.
Q. Did he ever discuss with you at all the problem of the exclusion for dishonesty, fraudulent crime and malice?
A. I don't think he has ever discussed that with me.
Q. Did he ever discuss with you the significance of having liability grounded on plural policy years rather than a single policy year?
A. No.
Q. Did he ever discuss with you the significance of having liability grounded in plural professional services rather than a single professional service?
A. Bill discussed with me that there wasn't any liabilities, not that any—
Q. Now, when you designed as much as a lawyer can design the defense strategy for the case, did you take into account ways in which you might put Mr. Evans in the best shape for the subject declaratory judgment action?
A. My only concern in designing the defense was an attempt to win the case for Mr. Evans.
Q. You paid no attention to whether if he lost it would put him in a better posture or worse posture in the subsequent case?

also clear that American Home frequently used counsel's firm to represent its insureds in liability actions.

When the insurer fails to provide independent counsel and thereby controls the defense in situations where there is an obvious conflict of interest, there is the danger that the insured will be prejudiced in one way or another in both the liability action and the subsequent coverage action. As has been demonstrated in this case, it is very difficult to prove specific instances of prejudice resulting from the failure to provide independent counsel. Nevertheless, the danger is real and the court is persuaded that a prophalactic rule is in order to alleviate the problem.

Michigan has instituted rules in other areas of insurance law to protect the insured in situations where the interests of the insurer and the insured are in conflict. For example, in *Wakefield v. Globe Indemnity Co.*, 246 Mich. 645, 225 N.W. 643 (1929), the court held that an insurer was liable to its insured for an excess of judgment over the face value of the policy when the insurer in bad faith refused to compromise a claim for an amount within the policy limit. In *Denham v. Bedford*, 407 Mich. 517, 287 N.W.2d 168 (1980), the court held that the insurer was liable for prejudgment interest in excess of its policy limit because it controlled the litigation. The court apportioned the prejudgment interest between the insurer and the insured in proportion to their respective liability on the primary judgment.

A. I did not take any part in the subsequent case or consider the position of American Home, what would be to its advantage or to Mr. Evans' advantage.
Q. I would never accuse you of having sought to pursue American Home; I was not—
A. In either way.
Q. Asking a different question; which is whether you were trying to take into account, on behalf of Mr. Evans' considerations that would bear on what posture did I leave him in the subsequent declaratory judgment action or was that not in your mind?

Both rules are designed to protect the insured in areas of conflict of interest. *Denham*, in particular, demonstrates a willingness on the part of the Michigan Supreme Court to fashion a prophalactic rule to encourage the insurer to act in ways deemed desirable by the court.

■ An insurer which contracts to indemnify for professional liability and which also contracts to provide defense is placed in a difficult position in a conflict case. It may choose not to defend, but the choice creates potential liability for breach of contract. On the other hand, it may choose to provide a defense with a reservation of rights. In the latter case the insurer's desire to control the litigation must give way to its obligation to defend the insured. *See* 7C Appleman, *Insurance Law and Practice* § 4685.01 (and cases cited therein); *Windt, supra,* at § 4.20 (discussing the appropriate way for the insurer to handle the defense in a conflict situation like the case at bar).

As recommended by Windt in his treatise at § 4.20, the insurer should provide independent counsel to control the defense or allow the insured to hire his own counsel to be paid by the insurer. The former option has an advantage in that it allows the insurer to satisfy itself that the action is being handled competently. Windt argues that independent counsel's role should be explained at the outset and that he or she should never be asked by the insurer to comment on coverage issues. Copies of all communication from counsel to the insurer and vice versa should be given to the insured.[5]

A. It wasn't in my mind what posture it would leave him or American Home in the subsequent action.
. . . .
Farrell deposition at 84–88.

5. Counsel provided by American Home communicated with American Home at least through letters addressed to Mr. Cunningham and one letter addressed to Mr. Childers. All of the letters are part of the record in this action. There is no evidence that Evans was given copies of the letters. There is also a copy of a memo from Mr. Cunningham to Mr. Ritter of American Home. The memo makes it clear that information gained from counsel provided to

By providing counsel with dual loyalties, American Home improperly controlled the litigation in the state action. It is insufficient to say that the injury here can be cured by applying principles of collateral estoppel. While it is true that American Home is bound by the record in the state action by having controlled the defense under section 58 of the Restatement Second of Judgments, it is also clear that under the express provisions of that section American Home would not be precluded from relitigating issues for which there is a conflict as defined therein. The Restatement, as mentioned earlier, does not appear to address the problem of the failure to provide independent counsel.

 The effect of applying principles of collateral estoppel must be read in connection with the burden of proof. Collateral estoppel works to the disadvantage of the party who bears the burden of proof. In this respect Green has the burden of proving all of the elements of his claim to recover on the policy, *i.e.*, the existence of the policy, underlying liability, and all conditions precedent to recovery under the contract of insurance. *See Strong v. Hercules Life Ins. Co.*, 284 Mich. 573, 280 N.W. 55 (1938). Hence, Green has the burden, under the general rule, of addressing the policy limits and proving that the claim falls within those limits. Green is clearly subject to collateral estoppel as being a party to the *Green v. Evans* suit. Consequently, Green is limited to the prior record in proving the elements of his claim to recover on the policy. American Home bears the burden of proof on the dishonesty exclusion under the general rule that the insurer has the burden of showing a violation of conditions avoiding an otherwise valid policy. *See Malicki v. Chicago Guaranty Fund Life Soc.*, 119 Mich. 151, 77 N.W. 690 (1899); *Carter v. State Farm Mut. Auto Ins. Co.*, 350 Mich. 535, 87 N.W.2d 105 (1957) (Insurer has burden on claim that insured failed to mitigate damages); *Mutual Benefit Life Ins. Co. v.*

*Abbott,* 9 Mich.App. 547, 157 N.W.2d 806 (1968) (insurer has the burden of proving material misrepresentations). It is likely that the party who carries the burden of proof as to a specific issue will fail to meet that burden in light of the collateral estoppel effect.

Green argues that the court should shift the burden of proof on the allocation problem to American Home because it failed to provide independent counsel. There is some support for this approach in *Duke v. Hoch,* 468 F.2d 973 (5th Cir.1972). In *Duke,* the insurer had conducted the defense for its insured in the liability action, despite the fact that the plaintiff in that action had claims for both covered and uncovered items. There had been no allocation in the liability action and the jury returned a verdict in a lump sum. In the subsequent action by the judgment creditor to recover under the policies, the insurer had obtained summary judgment because the judgment creditor was unable to prove the allocation and was collaterally estopped from going beyond the previous record. The Court of Appeals reversed this result, holding that the judgment creditor was relieved of the burden of proof.

> Insofar as the present record discloses, whether done ingeniously or ingenuously, [the insurer], in control of the defense, has protected its interest and secured for itself an escape from responsibility at the expense of the insureds, who remain personally liable for the full judgment, unprotected even to the extent they have paid for protection.

*Id.* at 979. The Court held that it was the duty of the insurer to inform the insured of the conflict of interest and the availability of a special verdict. In *Duke,* the insureds had both their own counsel and counsel retained by the insurer, who had control of the litigation. The Court felt that the insurer would have met its responsibility by disclosure but that the general disclosure of conflict in the form of the reservation of

defend Evans and counsel retained by American Home for the declaratory judgment action

merged at the Cunningham-Ritter level within American Home.

rights was not sufficient to meet the burden.

In the present case, Evans' personal counsel ceased active participation after counsel retained by American Home entered the case. There is no contention by the plaintiff that Evans was apprised of the allocation problem and, in fact the deposition testimony of counsel provided for Evans demonstrates that the insured was not so informed. *See* n. 4, *supra.* Under *Duke v. Hoch, supra,* American Home failed to meet its responsibility to its insured.

■ While *Duke* involved the application of Florida law, it is clear that Michigan recognizes a duty on the part of the insurance company to act in good faith with respect to the interests of its insured. *See Wakefield v. Globe Indemnity Co., supra.* Therefore, it is likely that Michigan would impose an obligation on the insurer to act in the interests of its insured if faced with a situation like the present.

■ To allow the burden of proof to remain upon the judgment creditor on the allocation problem under the circumstances permits the insurer to benefit by its own improper actions. The court is of the opinion that it is appropriate to shift the burden of proof on this issue based upon the failure to provide independent counsel and the failure to adequately warn the insured of the various aspects of the divergent interests involved.

Therefore, the defendant's motion with respect to the applicability of collateral estoppel and the burden of proof on the allocation problem is granted. Under this ruling it appears that American Home will be liable for $300,000 plus interest unless it can demonstrate, using the pleadings and the verdict in *Green v. Evans,* that the jury necessarily awarded specific amounts for specific professional services and that the application of the policy limits to the award so allocated results in liability for a lesser amount.

The last motion is for partial summary judgment that American Home is estopped from raising the defense that Evans failed to disclose possible claims against him when he applied for the 1976–77 policy. Because the court has held that the withdrawal from the trust that occurred in the 1976–77 policy year was not a separate professional service, this motion has, for all practical purposes, become moot.

American Home may submit a brief concerning the allocation of damages as outlined above within 20 days of the date of this order and the defendant will then have 10 days within which to respond. Absent a showing by American Home of a reasonable basis for allocation from the pleadings and the verdict of the case of *Green v. Evans,* the court will enter judgment for the defendant for $300,000 plus interest and costs.

SO ORDERED.