TWIN CITY FIRE INSURANCE COM-
PANY, and Hartford Casualty In-
surance Company, Plaintiffs,

v.

BEN ARNOLD–SUNBELT BEVER-
AGE COMPANY OF SOUTH CAR-
OLINA, LP, Sunbelt Beverage Compa-
ny, LLC, Harvey Belson, and William
Tovell, Defendants.

No. C/A 3:01–4769–17.

United States District Court,
D. South Carolina,
Columbia Division.

July 26, 2004.

Curtis L. Ott, Turner Padget Graham and Laney, Gary S. Parsons, Warren T. Savage, Bailey and Dixon, Columbia, SC, for Plaintiffs.

Eric S. Bland, Eric S. Bland and Associates, William E. Hopkins, Jr., McCutchen Blanton Rhodes and Johnson, Joshua L. Mallin, Dennis T. D'Antonio, Marc T. Wietzke, Weg and Myers, Columbia, SC, for Defendants.

## MEMORANDUM OPINION ON MOTIONS FOR FOR SUMMARY JUDGMENT

JOSEPH F. ANDERSON, JR., District Judge.

The pivotal issue presented in this declaratory judgment action is whether an insurance company forfeits its right to control civil litigation when it attempts to defend its insured under a reservation of rights notice. The case comes before the court on cross motions for summary judgment. The plaintiffs, Twin City Fire Insurance Company and Hartford Casualty Insurance Company (hereinafter "the insurers"),[1] seek a declaratory judgment with respect to their obligation to defend and indemnify the defendants, Ben Arnold–Sunbelt Beverage Company of South

---

1. Twin City Fire Insurance Company and Hartford Casualty Insurance Company both issued policies to the insureds in this case. The pertinent language of the two policies is identical. Therefore, for ease of reference, the court will refer to the two plaintiffs together as "the insurers."

Carolina, LP, Sunbelt Beverage Company, LLC, Harvey Belson, and William Tovell in two underlying civil actions filed in South Carolina state court. The state suits were filed by two female Ben Arnold–Sunbelt employees, Joyce Anglin and Ellen White. Both Anglin and White sought to recover damages for sexual harassment allegedly inflicted on them by Belson, who was Ben Arnold–Sunbelt's President and CEO. Claims were also asserted against Ben Arnold, Sunbelt Beverage, and William Tovell for Belson's alleged misconduct.[2]

In the action now before this court, the plaintiffs seek a determination that they are not liable to defendants for all legal fees, costs, and settlement amounts arising out of the Anglin and White lawsuits. For the reasons that follow, the court has determined that no genuine issue of material fact exists as to the claims for defense costs and indemnification by Ben Arnold, Sunbelt, and Tovell. The court will grant the insurers' motions for summary judgment as to these claims.

As to Belson's claims for defense costs and indemnification, the court will grant, in part, Belson's motion for summary judgment, having determined that there is no genuine issue of material fact regarding the purely legal question of whether Belson was entitled to a separate defense attorney. The issue of the reasonableness of the attorney's fees incurred by Belson is in dispute and for that reason, the court will proceed to trial on this factual issue only.

The parties have agreed that South Carolina law controls this action. The Supreme Court of South Carolina has not directly addressed the legal issues raised in this case. "In applying state law in diversity cases, [a] federal court ... must apply the law that it conscientiously believes would have been applied in the state court system." 19 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, FED. PRACTICE & PROC. § 4507 (2d ed.1996). "This principle embraces a wide variety of legal authorities, including the Restatements of Law developed under the auspices of the American Law Institute, scholarly treatises, law review articles and commentaries, judicial decisions from other jurisdictions whose doctrinal approach to legal matters is substantially the same as that of the forum state, the majority rule on the point in issue as reflected in a canvas of the prevailing law on the point throughout the country, and developing trends in the relevant field of substantive laws." *Id.*

Thus, the principal question in this case is whether the Supreme Court of South Carolina would adopt a per se disqualification rule that would entitle an insured to select independent counsel at its insurer's expense any time the insurer attempts to defend a lawsuit under a reservation of rights.[3] Having carefully analyzed the

2. The Anglin suit named as defendants Ben Arnold–Sunbelt Beverage Company of South Carolina, LP, Tovell, and Belson. The White action named Sunbelt Beverage Company, LLC, Ben Arnold–Sunbelt Beverage Company of South Carolina, LP, and Belson. It is not clear from the record exactly what corporate restructuring resulted in a second corporate defendant being added in the White case, but the parties have agreed that the fact that the defendants in the underlying suits were not identical is of no significance here. Belson was President and CEO of Ben Arnold when the harassment of Anglin and White allegedly occurred. Tovell replaced Belson as President and CEO of Ben Arnold in February 2001, and occupied that position when both of the underlying state lawsuits were filed.

3. A "reservation of rights" notice is a unilateral statement by an insurer in writing notifying the insured of its intention to continue with the defense while retaining the right to press all issues that could lead to a finding of non-coverage. BLACK'S LAW DICTIONARY 1082 (7th ed.1999).

question, the court concludes that South Carolina would not adopt such a rule. The court believes South Carolina would reject a per se disqualification rule because it rests upon the presumption that whenever a lawyer is confronted with a potential conflict of interest, the lawyer will always compromise the interests of the client. This court is not prepared to conclude that the South Carolina Supreme Court would engage in such a presumption.

## FACTS

Ben Arnold is a wholesale wine, spirits, and non-alcoholic beverage distributor in South Carolina. Ben Arnold purchased from the insurers two general commercial liability policies that covered claims for "personal injury" up to $1 million in the aggregate. Under the terms of the policies, "personal injury" was defined to include claims for defamation and false imprisonment. Claims for defamation and false imprisonment were alleged in both the Anglin and White actions. The policies did not cover claims for sex discrimination, assault and battery, civil conspiracy, or intentional infliction of emotional distress. Such claims were also asserted in the Anglin and White actions.

Ben Arnold timely notified the insurers of the lawsuits, and the insurers hired local counsel, Robert A. McKenzie of the firm of McDonald, McKenzie, Rubin, Miller & Lybrand, to defend the claims. McKenzie, a Columbia attorney, is a well-qualified and well-respected member of the South Carolina bar. Because only two of several claims asserted in the state actions were covered by the policies, the insurers decided to defend the suits under a reservation of rights. The insurers notified Ben Arnold that they were proceeding under a reservation of rights in two letters, both dated December 19, 2000.

Ben Arnold responded by rejecting McKenzie's representation and effectively ousting the insurers from the cases. Ben Arnold claimed McKenzie was automatically disqualified from representing it because he would be operating under either an actual or potential conflict of interest. The conflict of interest, according to Ben Arnold, arose solely because some of the claims were covered by the insurance policies while others were not.[4] Ben Arnold contended that since the insurers selected McKenzie and would be paying his fees, McKenzie would necessarily favor the insurance companies over the insured, and therefore would devote his energies toward a successful resolution of the covered claims, with no concern for the non-covered claims. Ben Arnold insisted that this conflict of interest entitled it to select its own lawyer, at the insurers' expense, to defend against all claims.

The insurers agreed that Ben Arnold had the right to select independent counsel to defend the non-covered claims. However, the insurers warned Ben Arnold that, under the terms of the policies, Ben Arnold would be responsible for the cost of the independent representation. Ben Arnold disagreed, insisting it had the right to choose its own lawyer to defend *all* claims and to be reimbursed for all reasonable fees and costs incurred.

In an effort to work out a solution, the insurers proposed having McKenzie defend the covered claims in conjunction with independent counsel selected by Ben Arnold, who would defend the non-covered claims. The independent counsel would be paid by the insurers. In other words, the insurers proposed sharing control of the litigation, subject to certain conditions.[5]

---

4. In its motion for summary judgment, Ben Arnold also argues that McKenzie was not competent to handle these type cases, including Title VII cases. These assertions are addressed later in this order.

5. By letter dated February 20, 2001, the in-

Ben Arnold refused.

Instead, Ben Arnold retained its own lawyers, proceeded with the litigation on its own,[6] left the insurers out in the cold, settled the cases, then demanded reimbursement. for all attorney's fees, costs, and settlement payments. The legal fees alone exceeded $1.5 million,[7] and the settlements totaled $830,000.[8] The insurers brought this action, while one of the state suits was still pending, asking this court to declare that they had no duty to pay. Ben Arnold counterclaimed for defense costs[9] and indemnification. Both sides have now moved for summary judgment..

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.1987) (citation omitted).

## DISCUSSION

1. The Claims By and Against Ben Arnold, Sunbelt, and Tovell

A. The Duty to Defend

i. Per Se Disqualification

It is at this point that the court must separate and discuss individually the claims by and against Ben Arnold, Sunbelt, and Tovell (hereinafter for ease of refer-

surers proposed the following, among other things: (1) other than decisions regarding settlement, McKenzie and Ben Arnold's independent counsel would act as co-counsel and share the control of the defense of the Anglin and White actions; (2) the insurers would pay each lawyer $150.00 per hour, (3) no work would be done without notice to the insurers; and (4) both lawyers would strictly comply with the insurers' billing procedures. Ben Arnold rejected this proposal by fax dated May 4, 2001, where Ben Arnold stated it believed the insurers had the obligation to pay for independent defense counsel "with no strings attached."

6. Both the Anglin and White cases were filed in state court. Eventually, both cases were removed to this court, although they were assigned to a different judge. The White case was eventually remanded to state court, with the consent of both parties. The Anglin case was referred to arbitration.

7. Four separate teams of lawyers were engaged to defend the underlying lawsuits: Littler Mendleson, New York and Atlanta; Eric Bland, Columbia, South Carolina; and Haynsworth Baldwin Johnson & Greaves, LLC, Greenville, South Carolina. The defendants contend that Bland was retained to represent Belson only, although the record is

not clear on this. The defendants also contend that the fees and costs associated with Bland's representation of Belson totaled $493,000. The insurers challenge this amount, which creates a genuine issue of fact for trial by this court.

8. The defendants settled with White for $315,000 and with Anglin for $515,000.

9. At some point during oral argument, the court expressed its concern that the defense costs for both of the underlying cases appeared to be excessive. At that point, counsel for Ben Arnold responded that the defendants were not, in fact, seeking to recoup *all* of their defense costs, but only so much of those fees incurred that the court might find to be reasonable under the circumstances. As with the argument that McKenzie was not qualified to handle Title VII claims (*see* Part 1.C. *supra*), this appears to be a newly-minted argument. In the demands conveyed to the insurers prior to the commencement of this action, and in their prayer for relief in this case, the defendants sought to recover *all* fees incurred in the defense of the underlying cases, not just an amount this court determines to be reasonable.

ence referred to collectively as "Ben Arnold") and those of Belson.[10] The position of Ben Arnold is succinctly set forth in its brief as follows:

> [B]ecause plaintiffs reserved their rights as it related to indemnification coverage for most of the causes of action and agreed to accept liability for indemnification with respect to two of the causes of action, a conflict of interest was created whereby defendants were entitled to retain counsel of their choosing with the reasonable fees for said counsel to be paid by plaintiffs.

Defendants' Memorandum dated April 4, 2003, at 4–5.

In advancing this argument, Ben Arnold seeks to have this court adopt a per se disqualification rule requiring the immediate disqualification of counsel selected by an insurance carrier any time the carrier purports to defend a civil action under a reservation of rights. Both parties agree that the Supreme Court of South Carolina has never squarely decided this issue, although Ben Arnold suggests that the per se disqualification rule represents the majority view nationwide.[11]

This court is reluctant to predict that South Carolina would adopt a disqualification rule that appears, on the surface, at least, to be premised upon the supposition that attorneys employed by insurance carriers will always behave unethically. In other words, the argument for the per se disqualification rule is based upon the assumption that attorneys employed by insurance carriers will seek to direct the course of litigation in a manner so as to achieve success on the claims that are covered under the policy, giving scant attention to the non-covered claims. Ben Arnold contends that when an insurance carrier defends under a reservation of rights, "the conflict is a glaring one, since ... the [insurers] would want any finding of liability against Ben Arnold to be premised upon intentional and other non-covered conduct." Defendants' Memorandum dated April 4, 2003 at 11.

■ This court declines to formulate a rule of law based upon the notion that attorneys will violate ethical obligations when employed by insurance companies. It is well-settled that an insurer's obligation to provide independent counsel is not based on insurance law; rather, it is based on a lawyer's duty of loyalty which prohibits him or her from representing conflicting interests. *James 3 Corp. v. Truck Ins. Exch.*, 91 Cal.App.4th 1093, 111 Cal.Rptr.2d 181, 186 (2001). A pertinent provision of the South Carolina Rules of Professional Conduct governs a lawyer's ethical obligation when paid by an insurance company to represent an insured:

> "A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

S.C. Rules of Professional Conduct, Rule 407; SCACR, Rule 5.4(c). "[A] lawyer hired by an insurer to represent an in-

---

**10.** It would appear that Tovell would be in the same relative position as Belson and entitled to an attorney other than the attorney representing the corporate defendants. *See* Part 2 *infra*. However, no such argument has been made by the defendants and the court must therefore treat Tovell's claims and defenses in the same manner as the corporate defendants' claims and defenses.

**11.** Ben Arnold goes so far as to suggest that "with the exception of a handful of courts, every court that has addressed this issue has found that an inherent conflict of interest is created once a reservation of rights letter is issued by the carrier, thus allowing the insured to select its own counsel and requiring the carrier to pay for such counsel." (Defendants' undated Memorandum filed May 13, 2003).

sured owes an unqualified duty of loyalty to the insured and must act at all times to protect the insured's interest." *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,* 439 Mass. 387, 788 N.E.2d 522, 540 (2003) (citation omitted); *see also Higgins v. Karp,* 239 Conn. 802, 687 A.2d 539 (1997) (holding duty of loyalty lies exclusively with the insured); *Trau–Med. of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691 (Tenn.2002) (holding duty of loyalty lies exclusively with the insured).

Members of the South Carolina bar are charged with the responsibility of properly determining whether an actual or potential conflict exists and, if so, whether withdrawal from the representation is required. Any conflict of interest determination in this case should have been made by McKenzie, not Ben Arnold. Nowhere has it been suggested that McKenzie determined a conflict of interest arose that disqualified him from representing Ben Arnold. In fact, Ben Arnold never allowed McKenzie to participate, so no conflict analysis was ever rendered by the lawyer who had the duty to make the call.

When, at oral argument April 1, 2004, the court expressed its skepticism regarding an argument based upon the assumption that attorneys will always behave unethically, counsel for Ben Arnold suggested a fallback position: Attorneys should not be placed in an ethical dilemma where they will be forced to choose between the duty of loyalty to the insured and their ties to the insurance carrier that is paying the bill. As counsel put it at oral argument, "One should not throw a pebble in front of a blind man." Thus, it is argued, attorneys should not be forced to participate in a case that requires them to exercise professional judgment. In short, attorneys should not be "tempted" to violate the ethical rules; hence, a per se disqualification rule is necessary to protect them from this temptation.

The court is unpersuaded by this argument as well. As counsel for the insurance carriers pointed out at oral argument, any attorney who maintains a trust account may be said to be "tempted," but this is not a reason to abolish trust accounts. And, distilled to its essence, the temptation argument is little more than a reassertion of the underlying premise that attorneys will behave unethically if given the chance.

Ben Arnold contends that two South Carolina decisions, one from the Supreme Court and one from a state trial court, reveal that South Carolina would adopt a per se disqualification rule if squarely presented with the issue. The court has carefully reviewed both of these decisions and finds them to be unpersuasive. Ben Arnold first relies on *dictum* from *Hegler v. Gulf Ins. Co.,* 270 S.C. 548, 243 S.E.2d 443 (1978) in which the South Carolina Supreme Court said "There is no material difference in legal effect between an outright refusal to defend and in undertaking the defense under a reservation of rights . . . ." *Id.* at 444. However, *Hegler* is clearly distinguishable from the facts of this case.

In *Hegler,* the question before the court was "whether an insured is entitled to recover attorney's fees incurred by him in the successful defense of a declaratory judgment action brought by the insurer in an effort to relieve itself of coverage under an automobile liability insurance policy." *Id.* at 443. The policy at issue in *Hegler* provided that the insurer would defend against any suit seeking damages for property or bodily injury. At the time the policy was in force, a passenger traveling in the insured's vehicle was injured and subsequently sued for damages. The insurer defended the third-party lawsuit (brought by the passenger) under a reservation of rights. The insurer then notified

the insured that it intended to bring a declaratory judgment action to determine liability under the policy, and the insurer advised the insured to retain independent counsel to defend the action. Because coverage was found, the insured sought reimbursement from the insurer for attorney's fees incurred while defending the declaratory judgment action.

The South Carolina Supreme Court noted that, under the general rule, "attorney's fees are not recoverable unless authorized by contract or statute." *Id.* at 444. Because no right to recovery was asserted under any statute, the court instead focused on the policy language, which provided that the insurer would "defend any suit against the insured ... seeking damages, even if any of the allegations of the suit are groundless, false, or fraudulent." *Id.*

The sentence from the opinion that Ben Arnold relies upon, that "[t]here is no material difference in legal effect between an outright refusal to defend and in undertaking the defense under a reservation of rights ..." must be put into context. What the Supreme Court said, in full, was:

> The declaratory judgment action established [the insurer's] obligation under the policy to defend the action for damages. If [the insurer] had refused initially to defend, it would undoubtedly have been liable for the payment of counsel fees incurred by [the insured] in the defense of the damage action. Instead however of refusing initially, [the insurer] began the defense and then sought, through the declaratory judgment action, to avoid any obligation to continue to defend. In order to obtain [the insurer's] continued defense of the action for damages, it was necessary for [the insured] to employ counsel to resist the contention by [the insurer] of lack of coverage. *There is no material difference in the legal effect between an outright refusal to defend and in undertaking the defense under a reservation of rights until a declaratory judgment is prosecuted to resolve the question of coverage.* In either event, an insured must employ counsel to defend in the first instance in the damage action and in the second in the declaratory judgment action to force the insurer to provide the defense. In both, the counsel fees are incurred because of the insurer's disclaimer of any obligation to defend.

*Id.* at 444 (emphasis added).

Thus, it can readily be seen that *Hegler* involved a legal question far removed from the one presented here. The quotation from *Hegler* (relied upon in Ben Arnold's brief) is quite selective. It does not comprise a full sentence and is taken entirely out of context. *Hegler* is inapplicable to this case.

A case more directly on point, although from a lower court decision in South Carolina, is *Ollie's Seafood Grille & Bar, LLC v. Selective Ins. Co. of S.C.*, C/A No. 01–CP–07–1994 (14th Jud. Cir. Nov. 27, 2002), decided by South Carolina Circuit Judge Perry Buckner. *Ollie's Seafood* was presented to this court for the first time at the hearing on April 1, 2004.[12] Ben Arnold contended that it had recently learned of the case from an article that appeared in *South Carolina Lawyers Weekly*, a legal newspaper published in South Carolina.

In *Ollie's Seafood*, an insured brought a declaratory judgment action against its commercial liability insurer, arising from a dispute over coverage for, and the defense of, an underlying personal injury action. The underlying lawsuit had asserted two tort claims against the insured: one for

12. The court heard oral argument from counsel on multiple occasions before issuing this order. The last round of arguments was conducted on April 1, 2004.

negligence, and one for vicarious liability for assault and battery allegedly committed by the insured's employees. The plaintiff in the underlying case sought compensatory and punitive damages. The insurer notified the insured that it was proceeding under a reservation of rights, and that the insured had the right to retain independent counsel at the insured's own expense. The insured contended that the reservation of rights gave rise to a conflict of interest that entitled the insured to independent counsel of its own choosing at the insurer's expense. Significantly, according to Judge Buckner's opinion, the parties did not dispute that the issuance of the reservation of rights notice gave rise to a conflict of interest between the insurer and its insured; the parties did not dispute that the insurer's denial of coverage for the two claims asserted; and, it was not disputed that the insured was entitled to independent counsel. The dispute arose over who had the right to select and who had the obligation to pay for independent counsel to defend the underlying lawsuit.

Judge Buckner noted that South Carolina had not squarely addressed the issue and therefore turned to authority from other jurisdictions. The court first addressed what it perceived to be the majority rule, set forth in *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (4th Dist.1984), the seminal case from California that adopted the per se disqualification rule. Next, the court examined the so-called minority rule, set forth in *Tank v. State Farm Fire & Cas. Co.*, 105 Wash.2d 381, 715 P.2d 1133 (1986), providing that, in cases where a conflict arises between the interests of an insurer and its insured, an "enhanced duty of good faith" arises on the part of the insurer, which, if met, entitles the insurer to select counsel to defend the insured, and thus control defense costs.

Judge Buckner concluded that "the *Cumis* rule is both most consistent with prior South Carolina law and most appropriate to protect the interests of both the insurer and the insured." *Ollie's Seafood Grille & Bar*, C/A No. 01–CP–07–1994 at 5. In *Cumis*, (which was not cited by Ben Arnold in its briefs), the court determined that:

> the Canons of Ethics impose upon lawyers hired by the insurer an obligation to explain to the insured and the insurer the full implications of joint representation in situations where the insurer has reserved its rights to deny coverage. If the insured does not give an informed consent to continued representation, counsel must cease to represent both. Moreover, in the absence of such consent, where there are divergent interests of the insured and the insurer brought about by the insurer's reservation of rights based on possible non-coverage under the insurance policy, the insurer must pay the reasonable costs for hiring independent counsel by the insured .... Disregarding the common interests of both insured and insurer in finding total nonliability in the third party action, the remaining interest of the two diverge to such an extent as to create an *actual, ethical conflict of interest*, warranting payment for the insured's independent counsel.

*Id.* at 506 (emphasis added).

█ It is well settled that the decision of a state circuit court is not binding authority on this court. Ben Arnold agrees that, at most, the *Ollie's Seafood* opinion is a prediction of what the South Carolina Supreme Court might ultimately decide. Ben Arnold points out that *Ollie's Seafood* relied, in part, on dicta from *BP Oil Co. v. Federated Mut. Ins. Co.*, 329 S.C. 631, 496 S.E.2d 35 (S.C.Ct.App.1998), as support for its belief that the South Carolina Court of Appeals has given "tacit approval of the

*Cumis* rule." *Ollie's Seafood,* C/A No. 01–CP–07–1994 at 6. The *BP Oil* court noted that "reimbursement for the insured's choice of counsel and expenses ordinarily fulfills the duty to defend, and is particularly appropriate where, as here, there is a conflict of interest between the insurer and the insured." *BP Oil,* 496 S.E.2d at 41 (citing *Cay Divers, Inc. v. Raven,* 812 F.2d 866, 870 n. 3 (3d Cir.1987)). This phrase, cited by Judge Buckner, appears to be nothing but a cursory mention relating to an insurer's duty to defend (not an insured's right to select independent counsel). Thus, this court does not find that the phrase constitutes dicta, let alone tacit approval of *Cumis.*

After carefully reviewing the two South Carolina cases and cases from many states, this court disagrees with Judge Buckner's conclusion that South Carolina would adopt the per se disqualification rule as set forth in *Cumis,* particularly in light of the fact that even courts in California have been reluctant to find a conflict of interest based upon the presumption that insurance defense counsel will behave unethically. *See* Christopher R. Wagner, *Making Reservations: Courts are Reluctant to Find a Conflict of Interest Based on the Presumed Malfeasance of Insurance Defense Counsel,* 26 L.A. LAW. 37, 38 (June 2003) ("[M]any California courts have been reluctant to find a Section 2680 conflict of interest without evidence of actual misconduct by insurance defense counsel.").

Additionally, the court is not persuaded that Ben Arnold is correct in its assertion that the per se disqualification rule represents the majority view nationwide. Ben Arnold recites a host of cases from other jurisdictions, most in one long string cite. In many of the cases cited by Ben Arnold, the courts go beyond the reservation of rights notice and explore the nature of the refusal to defend some claims. Most of the time, this deeper analysis reveals some true conflict, thereby triggering the disqualification of the attorney appointed by the insurance company based upon the conflict of interest discovered. In the instant case, however, Ben Arnold seeks to have this court stop the analysis at the reservation of rights notice that was issued by the insurers. Indeed, as one scholar has noted,

> Some courts ... have indicated that there is always a conflict of interest when an insurer defends subject to a reservation of rights, apparently on the theory that the carrier, believing that there may not be coverage, might provide only a token defense and be uninterested in achieving the lowest possible settlement. This is not, however, the majority view, and it is not good law.

Allen D. Windt, *Insurance Claims and Disputes* § 4:20 *Conflict of Interest Between Insured and Insurer* (4th ed. Sept. 2003) (West 2004).

To be sure, there are reported decisions, in addition to *Cumis,* squarely holding that a reservation of rights notice triggers a conflict of interest authorizing independent counsel at the insurer's expense. *See, e.g., Nandorf, Inc. v. CNA Ins. Co.,* 134 Ill. App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988, 994 (1985). The *Nandorf* court stated:

> In determining whether a conflict exists, Illinois courts have considered whether, in comparing the allegations of the complaint to policy terms, the interest of the insurer would be furthered by providing a less than vigorous defense to those allegations. An insurer's interest in negating policy coverage does not, in and of itself, create sufficient conflict of interest to preclude the insurer from assuming the defense of its insured. However, conflict of interest has been found where the underlying action asserts

claims that are covered by the insurance policy and other causes which the insurer is required to defend but asserts are not covered by the policy.

*Id.* 88 Ill.Dec. 968, 479 N.E.2d at 992 (internal citations omitted).

It should be noted that *Cumis* and *Nandorf* were both decided nearly twenty years ago. In the intervening years since those cases were decided, bar grievance committees have become much more active in ferreting out misconduct by attorneys, and legal malpractice claims have proliferated. Thus, the potential for client grievances against attorneys who "sell out" and lawsuits by clients whose interests have not been put first will, in many cases, minimize the evils that the *Cumis* rule was designed to combat. The Supreme Court of Hawaii recently recognized the salutary effect of existing ethical requirements in this area:

> There is no consensus on [the per se disqualification rule] issue nationwide. Reasonable minds can and do differ on the best resolution of the conflict inherent in the tripartite relationship among the insurer, the insured, and insurance defense counsel. The magnitude of the difficulty in resolving the issue is reflected in the volume of litigation nationwide and, in the instant case, the number of *amicus curiae* briefs representing divergent views. Upon balancing the respective pros and cons of suggested solutions to the issue, we are convinced that the best result is to refrain from interfering with the insurer's contractual right to select counsel and leave the resolution of the conflict to the integrity of retained defense counsel. Adequate safeguards are in place already to protect the insured in the case

of misconduct. If the retained attorney scrupulously follows the mandates of the Hawaii Rules of Professional Conduct (HRPC), the interests of the insured will be protected. In the event that the attorney violates the HRPC, the insured has recourse to remedies against both the attorney and the insurer.

*Finley v. Home Ins. Co.,* 90 Hawai'i 25, 975 P.2d 1145, 1151 (1998) (internal footnote omitted).

Importantly, on the facts of this case, the insurers and Ben Arnold shared the common interest of proving that Belson had not engaged in sexual harassment. All claims (covered and non-covered) asserted in both actions rested, in large part, on the factual allegation that Belson (then President and CEO of Ben Arnold–Sunbelt) repeatedly and intentionally subjected a female employee to inappropriate sexual touching and other improprieties during the course of her employment, and that Belson retaliated against her (by denying assignments or withholding privileges) when she refused his sexual advances. Virtually all of the alleged sexual harassment occurred while Belson and a female employee were alone in an office together. In other words, no third party witnessed the alleged harassment.[13]

Consequently, all claims (covered and non-covered) turned largely on who was telling the truth in a "he said, she said" swearing contest. If Belson was telling the truth and no sexual harassment had occurred, then Ben Arnold prevailed on all claims (covered and non-covered). If the female employee was telling the truth and Belson had sexually harassed her, the fact that some claims were covered and some

---

13. There were, of course, other issues presented in the underlying litigation. Anglin and White attempted to show that others in positions of authority with the corporate de-

fendants were, or should have been, aware of the alleged harassment. This necessitated discovery from individuals other than the participants in the alleged harassment.

were not covered would not have divided the defense. Both the insurers and Ben Arnold had the same interest in establishing that Belson was telling the truth and the employee was not.[14]

Although not suggested by the insurers, the court can surmise at least one policy reason why a per se disqualification rule is not wise: Such a rule would have the perverse effect of rewarding insureds who purchase less than full coverage. Normally, prudent businesses would elect to procure the most insurance coverage possible, given our litigious society. The per se disqualification rule suggested by Ben Arnold would favor insureds who purchase less than full coverage by allowing them to remove the insurance carriers from the case entirely, obtain lawyers of their choosing, and then send the bill to the insurance company.

■ Accordingly, the court rejects a per se disqualification rule giving an insured the right to retain independent counsel of its own choosing at the insurer's expense where only a potential for a conflict of interest exists because a reservation of rights notice has been given. The court finds those cases rejecting the per se rule to be better reasoned, more in line with South Carolina jurisprudence, and in accordance with traditionally accepted practices in South Carolina. *See, e.g., Fed. Ins. Co. v. X–Rite Inc.,* 748 F.Supp. 1223 (W.D.Mich.1990) (holding that conflict of interest posed by reservation of rights did not automatically entitle insured to select counsel of its choice at insurer's expense); *Cardin v. Pac. Employers Ins. Co.,* 745 F.Supp. 330, 336–38 (D.Md.1990) (rejecting

per se disqualification where only possibility of conflict exists); *Finley v. Home Ins. Co.,* 90 Hawai'i 25, 975 P.2d 1145 (1998) (holding reservation of rights does not automatically entitle insured to counsel of its own choosing); *L & S Roofing Supply Co. v. St. Paul Fire & Marine Ins. Co.,* 521 So.2d 1298 (Ala.1987) (finding that insurer's decision to defend under reservation of rights did not create a conflict of interest so as to entitle insured at the outset to engage defense counsel of its choice at insurer's expense); *Red Head Brass, Inc. v. Buckeye Union Ins. Co.,* 135 Ohio App.3d 616, 735 N.E.2d 48 (1999) (holding that insurer defending under reservation of rights not required to pay for independent counsel retained by insured); *Dynamic Concepts, Inc. v. Truck Ins. Exch.,* 61 Cal.App.4th 999, 71 Cal.Rptr.2d 882 (1998) (finding that reservation of rights did not create automatic conflict of interest); *Littlefield v. McGuffey,* 979 F.2d 101 (7th Cir.1992) (determining that possibility of conflict of interest not sufficient to trigger obligation of insurer to pay for independent counsel); *Foremost Ins. Co. v. Wilks,* 206 Cal.App.3d 251, 253 Cal.Rptr. 596 (1988) (finding reservation of rights letter alone not sufficient to trigger insurer's duty to pay for independent counsel).

■ Even more importantly, if South Carolina were to adopt the per se disqualification rule of *Cumis,* the rule would not be applicable to the unique facts presented in this case. When Ben Arnold first complained of the conflict of interest, the insurance carriers proposed (although under no obligation to do so) a compromise

14. The only time a conflict might have arisen (and this point was not argued by Ben Arnold) was at settlement. How much of the settlement would be attributed to the covered claims and how much to non-covered claims could have posed a problem. Here, it would have been in Ben Arnold's interest to attribute a larger portion of the settlement amount (up

to policy limits) to the covered claims, while it would have been in the insurers' interest to attribute a lower amount to the covered claims. However, these are not the facts of this case. Ben Arnold had long since abandoned the insurers when the day of settlement arrived. Moreover, no apportionment of the settlements was made in either action.

whereby Ben Arnold would be permitted to select an independent attorney to work along side McKenzie, with the insurance carriers paying for both attorneys under certain reasonable conditions. This arrangement would have satisfied any actual or potential conflicts of interest and renders Ben Arnold's actions in removing the insurance carriers from the litigation even more unreasonable.

## B. The Insurance Contract

Having determined that Ben Arnold wrongfully ousted the insurance carriers from the case, the court is left with the relevant policy language of the insurance contracts to determine the rights between the parties in this case.

### i. The Contractual Obligation Not to Incur Expense

The policies at issue here are general commercial liability policies purchased by and for the benefit of companies. The policies expressly provided under section 4, subsection 2(d): "No insureds will, except at their own cost, voluntarily . . . incur any expense, other than for first aid, without our consent." Thus, the insurers' approval of Ben Arnold's expenses was a prerequisite to reimbursement. The insurers warned Ben Arnold that if it insisted on continuing to defend the lawsuits with its own lawyers, Ben Arnold would have to pay all the costs. Even so, Ben Arnold, having disregarded the terms of the policies and having ignored the warnings, now seeks reimbursement for attorney's fees and costs totaling nearly $2 million.

### ii. The Contractual Duty to Cooperate

Additionally, under section 4, subsection 2(c)3 of the policies at issue in this case, Ben Arnold had a duty to cooperate with the insurers in the settlement of any claims or suit. To say Ben Arnold failed

to cooperate is a gross understatement. As noted earlier, there were no insurers to cooperate with at settlement because Ben Arnold had ousted them. While it is settled law in South Carolina that "a liability insurer may successfully defend upon the ground that the insured has violated the cooperation clause of the policy only when the breach has been material and has resulted in substantial prejudice to the insurer," *Evans v. Am. Home Assurance Co.*, 252 S.C. 417, 166 S.E.2d 811, 813 (1969), an insured may not completely ignore the terms and conditions of reimbursement, ignore repeated warnings that it may waive coverage by breaching the policy, and still enforce an insurer's obligation to pay a settlement.

■ Under the clear terms of the policies, Ben Arnold substantially failed to comply with the conditions and terms for reimbursement (failure to obtain prior approval of expenses and failure to cooperate), so as to relieve the insurers of all liability for defense costs for Ben Arnold.[15]

## C. McKenzie's Competency to Handle the Underlying Litigation

■ In the motion for summary judgment, Ben Arnold also asserts that McKenzie was rejected for a second reason: He was not competent to handle cases of the kind asserted by White and Anglin, particularly Title VII claims. The court rejects this argument for a variety of reasons.

First, it appears that this argument is something of an afterthought. Ben Arnold's May 4, 2001 letter rejecting the "shared defense" proposal advanced by the insurers (which is essentially the letter that broke off all communications between the parties) makes no mention of McKenzie's credentials. An earlier letter (dated

---

**15.** As noted previously, "Ben Arnold" includes Sunbelt and Tovell.

January 19, 2001) contains the following, somewhat ambiguous, passage: "While we do not doubt that Hartford believes Mr. McKenzie to be a skilled lawyer, our concern arises in the first instance as a consequence of the obvious conflict of interest that confronts Mr. McKenzie, *rather than his competency.*" (Emphasis added). The January 19 letter then invites the insurers to "provide whatever support you believe exists for your view [regarding the conflict of interest question] and [we] would also welcome a description of Mr. McKenzie's credentials including a description of his experience defending sexual harassment cases."

At oral argument, Ben Arnold suggested that the above quoted passage from the January 19, 2001 letter indicates that McKenzie's competency was, at least, a secondary concern and formed a part of the basis for the rejection of his representation. It was further asserted that the insurers never responded with information regarding McKenzie's competency.

Subsequent to the hearing, the insurers refuted this latter argument by referring the court to a letter providing information regarding McKenzie's competency. That letter, which is in the record, sets out McKenzie's competency in general terms, and invites Ben Arnold to explore McKenzie's competency further if it was so inclined. *See* letter from Mike Sigler, Claims Consultant for The Hartford to Arlyn B. Miller, Assistant General Counsel for Sunbelt, dated December 21, 2000. Thus, it cannot be said that the insurers refused to furnish McKenzie's qualifications when asked.

Moreover, it appears that, from the record in this case and from facts of which the court can take judicial notice, McKenzie was perfectly capable of handling this litigation individually or with counsel selected by Ben Arnold. The public record reveals McKenzie has been practicing in Columbia, South Carolina since 1966. He is a Diplomate with the American Board of Trial Advocates ("ABOTA")[16] and a Fellow of the American College of Trial Lawyers. He is also a member of the John Belton O'Neal Inn of Court, and chairs the South Carolina Supreme Court Commission on Continuing Legal Education. He has served as a member of the South Carolina Bar House of Delegates, and is a member of the Defense Research Institute.

Moreover, as the court has already noted, regardless of the nature of the legal claim asserted, this case boiled down to a credibility contest between Belson and his accusers. A South Carolina lawyer, with McKenzie's credentials, experienced in trying cases before South Carolina juries, was perfectly competent to handle all of these claims.

The argument that McKenzie was properly rejected because he was not qualified to handle sexual harassment cases under Title VII must be rejected for an additional reason as well: Counsel for the defendants suggest that Title VII claims predominated the underlying cases, but this court's own independent research has revealed that the Title VII claim was raised in the Anglin case only, and then only after the case had been referred to arbitration, not while the case was pending in court.

**16.** The title of Diplomate is conferred upon less than ten percent of the ABOTA membership. To be elected Diplomate, a lawyer must have at least twelve years of active experience as a trial lawyer, must have tried a minimum of 100 civil jury trials to conclusion in a court of general jurisdiction or federal court, or, in the alternative, must have tried 50 civil jury trials to conclusion and have acquired 1,000 points as defined by the ABOTA Bylaw IV, Section 1. In other words, the title of Diplomate is reserved for only the most experienced trial lawyers.

Counsel for Ben Arnold quite clearly suggested, both in their oral argument and in their briefs before this court, that McKenzie was not qualified for Title VII litigation. *See*, for example, Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment dated April 29, 2003 ("[McKenzie] was not adequate to defend the corporate defendants in a major sexual harassment/EEOC/Title VII litigation. As such, by selecting counsel who did not specialize in this type of law, plaintiffs violated their good faith duty owed to their insureds . . . .").

When this court pointed out, at the April 1, 2004 oral argument, that the copies of the complaints filed as part of the record in this action made no claims under Title VII, counsel for Ben Arnold responded that eventually the complaint in the Anglin case was amended to add a Title VII claim, and that the amended complaint containing the Title VII claim had inadvertently been omitted from the record in this case.

This court's own research revealed the following: Both the White and Anglin cases were filed in state court, alleging state common law causes of action only, and were thereafter removed to this court by the *defendants* who suggested that although Title VII was not expressly plead, Title VII was involved in the cases indirectly, thus federal jurisdiction was present.[17] Therefore, it was Ben Arnold, not the plaintiffs in the underlying cases, who first injected Title VII issues into the case. Even more importantly, while the cases were pending before the courts, Title VII claims were never added to the cases. The White complaint was never amended

to add a Title VII claim. It was not until the Anglin case was referred to arbitration that the complaint was amended in that case alone, *during arbitration*, to add a Title VII claim. This was done nearly a year after McKenzie's representation had been tendered by the insurers and refused by Ben Arnold. Moreover, after the Title VII claim was finally asserted, Ben Arnold contended before the arbitrator that the claim was time-barred as a matter of law because Anglin had not filed her charge of discrimination with the Equal Employment Opportunity Commission or South Carolina Human Affairs Commission within 300 days of the last alleged act of sexual harassment. *See* Letter from Dionysia Johnson–Massie, Littler Mendelson, Atlanta, to Judge Donald Rushing, Arbitrator, dated January 23, 2002. It is therefore somewhat disingenuous for Ben Arnold to now argue that McKenzie was unilaterally removed from the case because he lacked Title VII experience.

Although the Title VII issue had not arisen when McKenzie was rejected, even if it had, this would form no basis for rejecting McKenzie. The record reflects that McKenzie has, in fact, defended Title VII claims, including one brought by Eric Bland, the local counsel employed to defend Belson in this case.

### D. The Duty to Indemnify

■ In addition to seeking reimbursement for defense costs, Ben Arnold seeks to recover all sums, totaling $830,000, required to pay the compromise settlements in the Anglin and White actions. The court has already determined, for a variety

---

**17.** Defendants failed to disclose that when the Anglin and White cases were removed to this court, they were assigned to a different judge. To make matters worse, defendants did not file a correct response to the Local Rule 26.01 interrogatory (filed in the present action) that asked if the case was related to any other

action currently or formerly pending in this court. Failure to disclose the removal and failure to properly answer the Rule 26.01 interrogatory made it difficult for the court to independently determine the facts regarding the very late attempt to add the Title VII claim.

of reasons, that Ben Arnold is not entitled to seek reimbursement for defense costs under the facts of this case. The same result follows, as a matter of course, regarding the indemnification claim. In settling the claims after having booted the insurance carriers out of the case, Ben Arnold violated that provision of the policy that provides that the insureds shall not "voluntarily... incur any expense, other than for first aid, without [the carrier's] consent." Ben Arnold violated the duty of cooperation clause as well. These violations excuse the insurers from any obligation to indemnify Ben Arnold, Sunbelt, or Tovell.

### 2. The Claims By and Against Belson

In moving for summary judgment, Belson points out that as a defendant in the underlying actions, he was entitled to separate representation. In other words, even if McKenzie had been allowed to stay in the case, another attorney, besides McKenzie, should have been employed to defend Belson. Belson argues that his interests diverged from those of his employer in terms of providing a defense to the underlying actions. Simply stated, the corporations had an interest in distancing themselves from Belson. The corporations would want to demonstrate that if any sexual harassment or retaliation occurred, the conduct was the result of Belson acting alone, outside the course and scope of his employment. This by itself was a significant reason to consider providing a separate attorney to defend Belson.[18]

In an internal memo that is part of the record in this case, the insurers speculated that Belson might be entitled to separate counsel. *See* Memorandum from Michael W. Sigler to Thomas F. Morgan, of the insurers' Claims Department dated October 12, 2000. ("We may need to consider

whether separate counsel should be engaged to defend Belson and/or Tovell."). The insurers' memoranda do not even attempt to argue against the separate representation issue in Belton's motion for summary judgment. His position is ignored altogether by the insurers.

The issue is somewhat complicated by the fact that it appears that no demand for separate representation was ever made by Belson during the underlying lawsuits. Nevertheless, the readily apparent divergent interests between the corporation and its president, Belson (who was accused of intentionally harassing female employees at work), clearly called for separate representation.

The reservation of rights notice indicated that Belson would be provided with a defense, also under a reservation of rights, because the applicable policy language excluded from coverage actions of employees that were not made in the course and scope of their employment. Under Section II—"Who is an Insured?" Section 1(c) provides "Your 'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors." It would thus appear that the insurance carriers had an entirely defensible position in suggesting that Belson was not covered given the nature of the underlying claims.

■ Nevertheless, the carriers promised to defend Belson under a reservation of rights. Because Ben Arnold severed the negotiations between the insurance carriers and the insured at such an early stage, however, the litigation never proceeded to a point where a decision had to be made on separate representation for Belson. Such a decision can now be made by this court: Belson was entitled to sepa-

---

18. As noted previously, Tovell has not made an argument that he was entitled to an attor-
ney different from the one hired to defend the corporations.

rate representation, and his motion for summary judgment on the defense costs claim must be granted.

However, the court will deny Belson's motion for summary judgment insofar as it may be construed to assert a claim for indemnification for the settlements paid to Anglin and White. Having been ousted from the case by Ben Arnold and Belson, the insurance carriers were not allowed to participate in the settlement negotiations. Moreover, although Anglin and White asserted claims for defamation and false imprisonment (claims that were covered under the policies), it would appear that the conduct complained of more correctly fits under the Anglin and White claims for assault and battery and intentional infliction of emotional distress (claims that were not covered under the policies). For these reasons, the court will grant the insurers' motion for summary judgment on the claims by Belson for indemnification for settlement funds paid.

■ The court's grant of summary judgment to Belson on the defense costs claim is a partial grant of summary judgment relating to liability only. The court finds a genuine issue of material fact exists to the amount of defense costs reasonably expended to defend Belson and the underlying cases and the court will set this issue for trial. Both sides have consented to a bench trial as to the amount of the defense costs in this case.

### CONCLUSION

As to the claims by and against Ben Arnold, Sunbelt, and Tovell, the court concludes that the insurers fulfilled their obligation to defend the Anglin and White lawsuits by retaining well-qualified local counsel, Robert McKenzie. The parties agreed that because the insurers decided to proceed under a reservation of rights, Ben Arnold had a right to independent counsel. However, because no actual conflict of interest arose, Ben Arnold had no right to select its own lawyer at the insurers' expense on this basis. The court further finds that a potential for a conflict of interest simply is not sufficient to trigger an insurer's obligation to pay for independent counsel of an insured's own choosing. Finally, under the clear language of the policies, Ben Arnold is liable for all costs it voluntarily incurred without the insurers' consent. No consent was sought or given—and the insurers are not required to reimburse Ben Arnold—for attorney fees, defense costs, or settlement payments.

As to the claims by and against Belson, the court will grant Belson partial summary judgment and hold that the insurance carriers are responsible for reasonable defense costs incurred in the underlying civil actions. Because Belson's costs are the subject of considerable dispute, the court will conduct a bench trial on this issue as soon as its schedule will permit. Counsel will be seasonably notified of the trial date.

IT IS SO ORDERED.