**CENTRAL MICHIGAN BOARD OF TRUSTEES, Michigan University's Self–Insurance Corp., Plaintiffs,**

v.

**EMPLOYERS REINSURANCE CORP., Defendant.**

**No. 99–CV–10147.**

United States District Court,
E.D. Michigan,
Northern Division.

Oct. 3, 2000.

James D. Wilson, Ann Arbor, MI, for plaintiffs.

John R. Monnich, Troy, MI, for defendants.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DE-NYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

LAWSON, District Judge.

Plaintiffs have commenced an action invoking this Court's diversity jurisdiction to recover attorney fees and expenses they paid on behalf of Dr. Martin Spartz in defending an Isabella County, Michigan lawsuit alleging assault and battery. Janet Barnes alleged in her complaint in that case that Dr. Spartz, a Central Michigan University chemistry professor, made unwanted sexual contact with her in 1995 when she was a student at Central Michigan University.

At the time of the alleged incident Dr. Spartz was a member of the Michigan Education Association (MEA), which had contracted with defendant, Employers Reinsurance Corporation ("ERC"), to provide liability insurance coverage to "member[s] of the [MEA] [who also are members of] the National Education Association ... and ... employee[s] of a ... governing body of an educational unit." (ERC's National Education Association educator's Employment Liability Contract) ("ERC Contract"), p. 3. Dr. Spartz, therefore, was an "insured" under the ERC Contract.

Prior to filing the lawsuit, Ms. Barnes filed a complaint with Central Michigan University's Administrative Action Office which initially found in favor of Ms. Barnes. Dr. Spartz then procured representation of counsel who obtained a reversal of the University's affirmative action officer's decision.

When ERC received the summons and complaint in the Isabella County lawsuit, it wrote to Dr. Spartz to state that it would provide him a defense in the lawsuit but

reserved its right to contest its obligation to indemnify him for any liability that might ensue. ERC's representative observed that the complaint in the Isabella County lawsuit alleged an intentional tort (assault and battery) which may fall outside the scope of coverage. Nonetheless, ERC informed Dr. Spartz that it had requested the law firm of White, Przybylowicz, Schneider & Baird to defend him.

Three weeks later, Dr. Spartz wrote to ERC's representative to state that a conflict of interest existed between his interests and those of ERC. Dr. Spartz requested that he be permitted to choose his counsel instead of counsel selected by ERC. Dr. Spartz identified the attorney who successfully represented him in the University's administrative proceeding as his choice.

Dr. Spartz declined the services of the attorney from White, Przybylowicz, Schneider & Baird, Shirlee Bobryk. Ms. Bobryk has furnished an affidavit in this case, which is uncontested, averring that after she received her assignment from ERC, she spoke with Dr. Spartz, who "refused to cooperate in [her] efforts to represent him in the underlying Barnes case." Rather, Dr. Spartz' attorney from the administrative action represented him in the lawsuit.

Dr. Spartz was also a covered person under a comprehensive general liability insurance policy issued by plaintiff, Michigan University Self–Insurance Corporation (M.U.S.I.C.), to co-plaintiff, Central Michigan University Board of Trustees (CMU), which provided liability insurance coverage to CMU's employees. Pursuant to that policy, M.U.S.I.C. undertook the defense of Dr. Spartz in the lawsuit and agreed to pay the legal fees charged by the attorney chosen by Dr. Spartz. The Isabella County lawsuit was ultimately terminated by consent judgment in Dr. Spartz' favor without any liability payment.

Plaintiffs sought reimbursement from ERC for the cost of defending Dr. Spartz in the Isabella County lawsuit. When ERC refused to pay, plaintiffs commenced the present action claiming alternatively a breach of the insurance contract by ERC, an entitlement to contribution, and unjust enrichment. In response, ERC contends that "the plaintiffs" breached their contract by failing to cooperate with ERC in defending the lawsuit, and that ERC discharged its duty by appointing Shirlee Bobryk to represent Dr. Spartz.

The policy of insurance issued to CMU by M.U.S.I.C. provides in pertinent part:

Coverage A. Bodily Injury and Property Damage Liability

1. Coverage Agreement:

a. We will pay those sums that the "Covered Member Institution" becomes legally obligated to pay as damages because of "Bodily injury" or "Property damage" to which this coverage applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments—Coverages A, B and C. This coverage applies only to "Bodily injury" and "Property damage" which occurs during the Coverage Period. The "Bodily injury" or "Property damage" must be caused by an "Occurrence." The "Occurrence" must take place in the "Coverage territory." We will have the right and duty to defend any "Suit" or claim seeking those damages.

. . .

3. Other Coverage:

This coverage shall be excess of any other valid and collectible coverage available to you, whether such other coverage is stated to be primary, contributory, excess, contingent or otherwise. In addition, this coverage document shall not cover any loss for which you are entitled to recover under any other policy.

The ERC Contract provides in part:

A. COVERAGE A—EDUCATOR'S LIABILITY. ERC agrees to pay on

behalf of the Insured any and all loss, subject to the limit of liability, as set out in the declarations page for Coverage A. Such loss must be sustained by the Insured by reason of the liability imposed by law for damage caused by an occurrence in the course of the Insured's educational employment activities.

*Supplementary Coverage.* With respect to claims under Coverage A and in addition to the coverage indicated above, ERC shall:

1. Investigate, defend, negotiate and settle any claim even if such claim is groundless or fraudulent. ERC shall not be obligated to investigate, defend or conduct settlement negotiations on any claim reported to ERC after the limit of liability with respect to the member against whom the claim is made and/or the limit of liability with respect to the occurrence has (have) been exhausted by payment of loss.

   The Insured may retain at the Insured's expense, counsel of its choosing to assist ERC when a claim seeks damages which exceed the limit of liability stated in the declarations for this coverage. With regards to claims brought other than in the United States, its territories or possessions or Canada, ERC may choose to reimburse but not defend the Insured for the reasonable costs actually incurred in any such defense, upon notice to the Insured of such decision.

   . . .

5. Pay all reasonable expenses, other than loss of earnings, incurred at ERC's request.

   . . .

VIII. CONDITIONS.

   . . .

1. OTHER INSURANCE. This is a manuscript contract. It was written and priced to reflect the intent of all parties that, if at the time of the loss there is any other insurance available to the Insured which covers such loss, or which would have covered such loss except for the existence of this contract, then ERC shall not be liable for any amount other than the excess over any other valid and collectible insurance applicable to a loss hereunder. Other valid and collectible insurance includes, but is not limited to, policies or insurance programs of self-insurance purchased or established by or on behalf of an educational unit to insure against liability arising from activities of the educational unit or its employees, regardless of whether or not the policy or program provides primary, excess, umbrella, or contingent coverage. . . .

The parties have filed cross-motions for summary judgment. The Court finds that the parties have adequately set forth the relevant law and facts in their briefs and motion papers, and oral argument would not aid in the disposition of the instant motion. *See, E.D.Mich. LR 7.1(e)(2).* Accordingly, the Court **ORDERS** that the motion be decided on the briefs submitted. For the reasons stated below, the defendant's Motion for Summary Judgment is **GRANTED** and the plaintiffs' Motion for Summary Judgment is **DENIED.**

I.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to re-

quire submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

█ A party may support a motion for summary judgment by demonstrating that an opposite party, after sufficient opportunity for discovery, is unable to meet her burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not merely rely upon the pleadings to oppose a motion for summary judgment but must come forward with affirmative evidence in the form of materials described in Rule 56(c) to establish a genuine issue on a material fact. *Id.* at 324, 106 S.Ct. 2548. Even in complex cases, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476–81 (6th Cir. 1989).

## II.

█ The legal premise which anchors plaintiffs' argument that ERC should be liable for the defense costs incurred by plaintiffs in the Isabella County lawsuit is that the issuance of the reservation of rights letter by ERC created a conflict of interest which obligated ERC under Michigan insurance contract law to permit its insured to retain counsel of his own choice at ERC's expense. Although other federal courts applying Michigan law have addressed this issue, *Federal Ins. Co. v. X-Rite, Inc.,* 748 F.Supp. 1223 (W.D.Mich.

1990), *American Home Assurance Co. v. Evans,* 589 F.Supp. 1276 (E.D.Mich.1984), *vacated on other grounds,* 791 F.2d 61 (6th Cir.1986),[1] no Michigan appellate court has definitively decided the question.

█ In federal cases based on diversity jurisdiction, the court must apply the law of the state's highest court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir.1995) (*quoting Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985)). "Relevant data" includes the state's intermediate appellate court decisions, *id.,* as well as the state supreme court's relevant *dicta,* "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806, 807 (6th Cir.1987).

### A.

█ Under Michigan law, if an insurer contests its obligation to provide coverage to an insured under a policy of insurance it must give timely notice to its insured. *Meirthew v. Last,* 376 Mich. 33, 135 N.W.2d 353 (1965). Thereafter, the insurer may proceed in one of two ways:

> It can undertake the defense with notice to the insured that it is reserving the right to challenge its liability on the policy. The second alternative for the insurer is to repudiate liability, refuse to defend and take its chances that there will be a showing that there is no coverage for the insured's liability.

*Detroit Edison Co. v. Michigan Mut. Ins. Co.,* 102 Mich.App. 136, 145, 301 N.W.2d 832 (1980). *See also, VanHollenbeck v. Ins. Co. of North America,* 157 Mich.App. 470, 480, 403 N.W.2d 166, *lv. app. denied,* 428 Mich. 903 (1987), *St. Paul Ins. Co. v.*

---

1. Judge Nancy Edmunds discussed this issue without deciding it in *Aetna Cas. and Surety Co. v. Dow Chemical Co.,* 44 F.Supp.2d 847, 860–61 (E.D.Mich.1997).

*Bischoff,* 150 Mich.App. 609, 613, 389 N.W.2d 443 (1986). Michigan courts have said that defending under a reservation of rights is the preferred option. *Detroit Edison, supra,* 102 Mich.App. at 145, 301 N.W.2d 832. This is so because an insurer's obligation to pay indemnity is separate and distinct from its duty to defend its insured. *Stockdale v. Jamison,* 416 Mich. 217, 330 N.W.2d 389 (1982). The duty to defend in many respects is broader than the duty to indemnify. *American Bumper and Mfg. Co. v. Hartford Fire Ins. Co.,* 452 Mich. 440, 550 N.W.2d 475 (1996). The duty to defend is severable from and not dependent upon the duty to indemnify. *Zurich Insurance Company v. Rombough,* 384 Mich. 228, 180 N.W.2d 775 (1970).

### B.

■ Once the insurer "reserves its rights" to contest its obligation to make indemnity payments, the interests of the insurer and those of the insured come into conflict. *Kirschner v. Process Design Associates, Inc.,* 459 Mich. 587, 595, 592 N.W.2d 707 (1999). It is clear under Michigan law that, in such circumstance, the same attorney may not properly represent both the insurer and the insured. *See, Meirthew v. Last, supra.* No one in this case contends that Ms. Bobryk or her law firm represented ERC. The question then is whether the insurer discharged its duty to defend in this case by hiring independent counsel for the insured. The plaintiffs argue that this question should be answered in the negative by contending that (1) the law requires the insurer to permit the insured to choose his own attorney whose fees must be paid by the insurer; and (2) in this case Ms. Bobryk was not truly "independent."

### 1.

The legal issue in plaintiff's first argument was decided by Judge Robert Holmes Bell in *Federal Ins. Co. v. X–Rite, Inc., supra.* In that case, the insured, X–Rite, was sued by a discharged employee in a multiple-count complaint alleging both negligent and intentional conduct. X–Rite's attorneys responded to the complaint and X–Rite subsequently notified its insurer, Federal Insurance Company ("Federal"), of the litigation and the representation by X–Rite's own attorneys. Federal responded with correspondence acknowledging the suit, reserving the right to deny coverage on claims not covered by the policy, and proposing the substitution of another law firm to represent X–Rite. X–Rite did not answer this correspondence but rather continued the defense of the lawsuit with its own attorneys. The lawsuit was ultimately settled when the litigants accepted a mediation award. X–Rite then demanded that Federal pay the settlement amount and also reimburse X–Rite for the fees it paid to its own attorneys. Federal filed a declaratory judgment action seeking absolution from all liability because X–Rite breached its insurance contract by refusing to cooperate in the defense, refusing to allow Federal to discharge its duty to defend, and settling the case without Federal's consent. X–Rite counter-claimed for the payments it had previously demanded of Federal.

Judge Bell observed that there is no definitive Michigan appellate court ruling on the question of whether an insurer must pay for counsel selected by the insured when an insurer-issued reservation of rights letter creates a conflict of interest. To ascertain Michigan law using "all available data," *Angelotta, supra,* 820 F.2d at 807, that Court referred to *dicta* contained in the opinion of Justice Patricia Boyle (in which four other justices concurred) in *Allstate Ins. Co. v. Freeman,* 432 Mich. 656, 703, 443 N.W.2d 734 (1989), in which she observed that once it is determined that an insurer has a contractual duty to defend, "public policy comes to bear on the exercise of the duty by the insurer." In a footnote to this passage, Justice Boyle quoted the following language:

It has been held that the insured is not deprived of his contractual right to have

a defense provided by the insurer when a conflict of interest between the two arises under the described circumstances, and it has been suggested that when such a conflict of interest arises, the insured must be informed of the nature of the conflict and given the right either to accept an independent attorney selected by the insurer or to select an attorney himself to conduct his defense; if the insured elects to choose his own attorney, the insurer must assume the reasonable costs of the defense provided. Anno: *"Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured," 31 A.L.R.4th 957, 976* [ (1984) ].

432 Mich. at 704, n. 3, 443 N.W.2d 734.

Judge Bell also made reference to another decision of this Court on the issue, *American Home Assurance Co. v. Evans, supra,* in which Senior Judge Charles Joiner held:

"An insurer which contracts to indemnify for professional liability and which also contracts to provide defense is placed in a difficult position in a conflict case. It may choose not to defend, but the choice creates potential liability for breach of contract. On the other hand, it may choose to provide a defense with a reservation of rights. In the latter case the insurer's desire to control the litigation must give way to its obligation to defend the insured.... [The insurer] should provide independent counsel to control the defense or allow the insured to hire his own counsel to be paid by the insurer."

589 F.Supp. at 1286.

The difference between Justice Boyle's *dictum* and Judge Joiner's holding, observes Judge Bell, is:

While Judge Joiner concluded the insured's interest should be protected, his ruling implicitly gave the *insurer* the option of providing independent counsel or permitting the insured to retain counsel of its choice. Herein lies the subtle difference between his ruling and the implication of Justice Boyle's dicta.

*Federal Ins. Co., supra,* 748 F.Supp. at 1227. The Court then resolved the difference in favor of the insurer:

Precedent from other jurisdictions does offer little definitive guidance as to the direction Michigan law should be expected to take. Nonetheless, reviewing them thoroughly has led the Court to the settled conclusion that, under the facts of this case, X–Rite was not entitled to insist on counsel of its choice at Federal's expense.

*Id.* at 1228.

To support this conclusion, the Court pointed to several factors, including (1) that Federal followed black letter Michigan law in defending under a reservation of rights, (2) that X–Rite's objection to the assigned law firm was based on the questioned competence of the attorney, not a challenge to his independence, (3) that X–Rite ignored the proposal to substitute counsel and proceeded with its own attorneys without attempting to determine the likelihood of prejudice that might result from representation by counsel assigned by the insurer. The Court also gave weight to policy language which not only imposed upon Federal a duty to defend but also reserved to it the "right to defend." The Court held that this contract language "must be viewed as conferring upon Federal some prerogative with respect to the defense beyond simply paying expenses." *Id.* at 1229. Finally, the Court observed that there was no evidence that the assigned law firm was not truly "independent." *Id.* at 1230.

The Court concluded that, since X–Rite voluntarily retained the services of its counsel, Federal was not obligated under the policy to reimburse X–Rite for these expenses.

■ This Court agrees with the learned judge from the Western District and finds that under Michigan law an insurer com-

plies with its duty to defend when, after it has reserved its rights to contest its obligation to indemnify, it fully informs the insured of the nature of the conflict and selects independent counsel to represent the insured in the underlying litigation. The insured has no absolute right to select the attorney himself, as long as the insurer exercises good faith in its selection and the attorney selected is truly independent.

The Court acknowledges that this rule is not universally followed, and there are divergent views on this issue which appear to be "jurisdiction specific." *See,* 14 Couch, *Insurance 3d* § 202:35, pp. 202-87 – 202-92. It has, however, been applied in well-reasoned opinions by other courts. *See, e.g., Spindle v. Chubb/Pacific Indemnity Group,* 89 Cal.App.3d 706, 152 Cal. Rptr. 776 (2d Dist.1979), *Bartels v. Romano,* 171 N.J.Super. 23, 407 A.2d 1248 (App. Div.1979), *Bituminous Ins. Cos. v. Pennsylvania Mfgr's Assoc. Ins. Co.,* 427 F.Supp. 539 (E.D.Pa.1976), *Safeco Ins. Co. of America v. Butler,* 118 Wash.2d 383, 823 P.2d 499 (1992), *New York State Urban Development Corp., v. VSL, Corp.,* 738 F.2d 61 (2d Cir.1984).

There are several factors which direct the Court to this conclusion in the present case. First, although Dr. Spartz apprehended the conflict of interest with ERC that resulted from the reservation of rights letter, he never contended that Ms. Bobryk or her law firm were embroiled in that conflict or aligned with the insurer. Indeed, it does not appear that Dr. Spartz ever investigated the issue, but rather he relied upon authority from other jurisdictions which does not apply in Michigan.[2] Second, Dr. Spartz' main contention was that he had success with one lawyer in the controversy, and wanted to bring that lawyer's knowledge of the facts and witnesses into the Isabella County lawsuit. It appears that the reservation-of-rights-induced conflict was used by Dr. Spartz as a device to achieve that goal; that Ms. Bobryk was selected by the insurer was not his main concern. In fact, it is reasonable to infer from the undisputed evidence submitted by the parties that *any* attorney selected by defendant, or anyone else, would not have satisfied Dr. Spartz if it were not the person who successfully represented him at the University's administrative hearing.[3] Third, the ERC insurance contract limits ERC's obligation to pay expenses to those circumstances where the "reasonable expenses" are "incurred at ERC's request." It is undisputed that the legal expenses of Dr. Spartz' private attorney were not incurred at the request of the defendant.

2.

■ Of course, if ERC did not exercise good faith in its selection of Ms. Bobryk and her law firm, then it cannot claim that it fulfilled its duty to defend. Thus, ERC will have breached its contract if the law firm selected was not truly independent and capable of defending Dr. Spartz. *See, New York State Suburban Development, Corp. v. VSL, Corp, supra.*

Plaintiffs argue, without any supporting affidavits or other documentation, that Ms. Bobryk was inexperienced in defending claims of the sort brought in the Isabella County lawsuit. They also claim that she was not truly independent because (1) her law firm had negotiated contracts with CMU on behalf of the MEA; (2) she was

---

2. As to the divergent holdings of various courts, one commentator has warned:

"The following views cannot be reconciled except to note that the holdings of the court are jurisdiction specific. Therefore, counsel representing either the insurer or insured should review the holdings of the applicable jurisdiction before drawing any definitive conclusions." 14 Couch, *Insurance 3d,* § 202:35, p. 202-87.

3. This is not to suggest that Dr. Spartz' desire was inherently unreasonable. It made both economic and tactical sense to hire a lawyer who was familiar with the facts in a related matter and had actually prevailed in the previous controversy. That Dr. Spartz' previous attorney was not on ERC's approved list, which was furnished by the MEA, was not a concern of Dr. Spartz, although it was an apparent obstacle for ERC.

selected by ERC; and (3) she filed an affidavit in this case in support of ERC's position.

■ As to the first contention, Ms. Bobryk's law firm's prior or contemporaneous involvement in negotiating contracts for the MEA with CMU does not create a conflict. Dr. Spartz was a member of the MEA. Neither CMU nor the MEA was adverse to Dr. Spartz in the Isabella County lawsuit. Plaintiffs have offered no support for their suggestion that there was any divided loyalty or acquisition of confidential information that arose or could have arisen from the prior representation which could result in a conflict of interest between Dr. Spartz and Ms. Bobryk or her law firm.

■ Next, the mere fact that defense counsel was assigned by the insurer is, by itself, insufficient under Michigan law to establish lack of independence. Michigan courts have recognized that the interrelationship among defense counsel, the insured and the insurer "contains rife *possibility* of conflict." *Atlanta International Ins. Co. v. Bell,* 438 Mich. 512, 519, 475 N.W.2d 294 (1991) (emphasis added). Yet for the very reason that the interest of the insured and the insurer are not always congruent, "courts have consistently held that the defense attorney's primary duty of loyalty lies with the insured, and not the insurer." *Id.* at 520, 475 N.W.2d 294.

■ An attorney occupies a fiduciary relationship with her client. Keeton & Widis, *Insurance Law,* p. 822. The essence of the fiduciary duty is the recognition that one who acts in a representative capacity frequently must subjugate his interest to the person represented. To suggest that human nature prevents the harnessing of action motivated by self-interest is to contend that fiduciary relationships are unworkable. The law soundly rejects this contention.

■ Although an attorney is selected by an insurance company, the fees charged are paid by the insurance company as a benefit for which the insured has contracted, not because there is a duty of allegiance by the attorney to the insurer which eclipses the duty to the insured. The primary duty of the attorney is always to the client, not to the entity who happens to be paying the bill. *Continental Cas. Co. v. Pullman,* 929 F.2d 103, 108 (2d Cir. 1991).

A conflict of interest, therefore, will not be presumed merely because an insurer chooses defense counsel.[4] There must be evidence of a conflict sufficient to raise a question of fact in order to avoid summary judgment on the issue. *Anderson v. Liberty Lobby, Inc., supra.*

In this case, the only evidence in the record on this point is Ms. Bobryk's affidavit. Therein she avers that she "was willing and able to represent the independent interest of Dr. Martin Spartz without regard to whether the insurance company reserved its rights to pay indemnity. [She] intended to provide representation that was in his best interest without regard to the insurance company desires or issues." No contrary evidence has been offered.

Further, the selection of counsel by ERC was not unfettered. Rather, the MEA, of which Dr. Spartz was a member, furnished an approved list of attorneys who could be chosen to represent MEA member-insureds. Dr. Spartz, therefore, through the action of his union representatives can be said to have indirectly participated in the selection of counsel. That fact supports rather than undermines a finding that the assigned defense attorney was truly independent.

■ Finally, there is no merit to the contention that Ms. Bobryk's execution of

---

4. It has been held that actions demonstrating greater concern for the insurer's interest than the insured's interest were required to support a finding of a conflict of interest. *Mutual Service Cas. Ins. Co. v. Luetmer,* 474 N.W.2d 365 (Minn.App.1991).

an affidavit in July, 2000 establishes her lack of independence in March, 1997 when she was assigned the case. The affidavit does not disclose any confidential communications. Indeed, it establishes the absence of any meaningful attorney/client relationship due to Dr. Spartz' failure to cooperate with Ms. Bobryk in defending the Isabella County lawsuit. The affidavit merely reports the facts, which are uncontested. It does not compromise Ms. Bobryk's independence.

Discovery in this case closed on March 15, 2000. Each side has had an adequate opportunity to discover the facts. Because the parties have filed cross-motions for summary judgment, now is the time for plaintiffs to " 'put up or shut up' on [this] critical issue" of assigned defense counsel's independence and competence. *Street v. J.C. Bradford & Company, supra,* 886 F.2d at 1478. No such showing which would demonstrate a genuine issue for trial has been made. There is no merit, therefore, to the contention that counsel assigned by ERC was not truly independent or capable of conducting Dr. Spartz' defense of the Isabella County lawsuit.

### C.

ERC was not obliged to honor Dr. Spartz' selection of defense counsel. ERC discharged its duty to defend under the ERC policy by assigning Ms. Bobryk and her law firm to defend the Isabella County lawsuit. It is undisputed that ERC did not authorize Dr. Spartz to incur the expense of separate counsel whom he selected. To the extent that the plaintiff's claim for reimbursement of defense costs is dependent on the rights and privileges of Dr. Spartz under the ERC policy, that claim must fail as a matter of law.

### III.

Plaintiffs also assert a right to recovery against ERC based upon the language in M.U.S.I.C.'s policy which provides that the benefits payable shall be excess to other valid and collectible insurance coverage. Plaintiffs cite *St. Paul Fire & Marine Ins. Co. v. American Home Assurance Co.,* 444 Mich. 560, 514 N.W.2d 113 (1994), for the proposition that when two applicable insurance policies each contain "other insurance" clauses, one being an "excess" clause and the other being a "pro rata" clause, the policy with the "pro rata" clause becomes primary.[5] Plaintiffs argue, therefore, that ERC should bear all of the defense costs paid by plaintiff M.U.S.I.C. in the Isabella County lawsuit.

Plaintiff's argument is defective for several reasons. First, the language in ERC's policy relating to other insurance renders it an "excess" clause, not a "pro rata" clause. *St. Paul Fire,* therefore, does not fulfill the task of providing a basis of reconciling the competing clauses.

Second, the "other insurance" language in M.U.S.I.C.'s policy includes not only an "excess" clause but also an "escape" clause. This Court has not found, and the parties have not cited, any Michigan case which prescribes the manner in which an escape clause and an excess clause can be reconciled. The "traditional" rule renders the insurance policy with the escape clause primary, requiring its coverage to be exhausted before resorting to the policy with the excess clause. *See,* 15 Couch, *Insurance 3d,* § 219: 15, pp. 219–69 – 219–70. Another approach calls for a declaration that the clauses are mutually repugnant and proration of the loss. *See, id.*

One might also view the two "other insurance" clauses presently before the Court as both "excess" clauses. There is no Michigan Supreme Court decision on the manner in which these clauses would be reconciled, but the likelihood is that the loss would be prorated. *See, Mary Free Bed Hospital & Rehab. Center v. Ins. Co. of North America,* 131 Mich.App. 105, 345 N.W.2d 658 (1983).

---

**5.** For a description of the types of "other insurance" clauses, *see Federal Kemper Ins. Co. v. Health Ins. Administration, Inc.,* 424 Mich. 537, 542–43, 383 N.W.2d 590 (1986).

 The Court finds in this case, however, that it is unnecessary to reconcile the competing "other insurance" clauses.

 The plaintiffs have already paid the expenses and seek contribution on the ground that the defendant "fail[ed] to meet its duties and obligations under its contract of insurance and to provide a defense to Dr. Spartz," (Complaint ¶ 30), and on the theory of unjust enrichment. Under Michigan law, the right of an insurer who pays the total amount of a loss to seek contribution from a co-insurer who also is on the risk is based on the theory of subrogation. *Detroit Automobile Inter-Insurance Exchange v. Detroit Mut. Auto. Ins. Co.*, 337 Mich. 50, 55, 59 N.W.2d 80 (1953). *See also, State Farm Fire & Cas. Co. v. Farmers Ins. Exchange*, 80 Mich. App. 567, 571, 264 N.W.2d 62 (1978). *C.f., Commercial Standard Ins. Co. v. American Employers Ins. Co.*, 209 F.2d 60 (6th Cir.1954).

 Under Michigan law relating to subrogation, "the subrogee acquires no greater rights than those possessed by the subrogor, and ... the subrogee may not be a 'mere volunteer.'" *Hartford Accident & Indemnity Co. v. Used Car Factory*, 461 Mich. 210, 215, 600 N.W.2d 630 (1999), *citing Smith v. Sprague*, 244 Mich. 577, 579–80, 222 N.W. 207 (1928). Although the "volunteer" limitation is generally inapplicable to an insurer seeking contribution from a co-insurer, *Detroit Automobile Inter-Insurance Exchange v. Detroit Mut. Auto. Ins. Co., supra.*, the subrogees, in this case the plaintiffs, must bear the burden of their subrogor's conduct.

This Court has held that Dr. Spartz was not entitled to incur the expenses of private counsel, and that legal costs paid to counsel of Dr. Spartz' selection were his own responsibility. In their quest for contribution, plaintiffs must also be bound by this ruling.

Plaintiffs, therefore, are not entitled to contribution for the payments they made to the attorney Dr. Spartz selected to defend him in the Isabella County lawsuit.

### IV.

For the reasons stated, the plaintiffs' Motion for Summary Judgment [document 17] is **DENIED** and the defendant's Motion for Summary Judgment [document 16] is **GRANTED**.

**IT IS SO ORDERED.**