**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TWIN CITY FIRE INSURANCE COMPANY;
HARTFORD CASUALTY INSURANCE
COMPANY,

    *Plaintiffs-Appellees,*

v.

BEN ARNOLD-SUNBELT BEVERAGE
COMPANY OF SOUTH CAROLINA, LP;
SUNBELT BEVERAGE COMPANY, LLC;
HARVEY BELSON; WILLIAM TOVELL,

    *Defendants-Appellants.*

No. 04-2048

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-01-4769-3)

Argued: September 21, 2005

Decided: December 27, 2005

Before LUTTIG, Circuit Judge, HAMILTON, Senior Circuit Judge,
and James C. DEVER III, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Dever wrote the opinion, in
which Judge Luttig and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** William Elvin Hopkins, Jr., MCCUTCHEN, BLANTON,
JOHNSON & BARNETTE, L.L.P., Columbia, South Carolina, for

Appellants. Gary S. Parsons, BAILEY & DIXON, Raleigh, North Carolina, for Appellees. **ON BRIEF:** T. English McCutchen, III, MCCUTCHEN, BLANTON, JOHNSON & BARNETTE, L.L.P., Columbia, South Carolina; Dennis T. D'Antonio, Joshua L. Mallin, WEG & MYERS, P.C., New York, New York, for Appellants. Warren T. Savage, BAILEY & DIXON, Raleigh, North Carolina, for Appellees.

---

### OPINION

DEVER, District Judge:

When a party with insurance coverage is sued, the insured notifies the insurance company of the suit. The insurance company, in turn, typically chooses, retains, and pays private counsel to represent the insured as to all claims. If the suit involves some claims that are covered under the insurance policy and some claims that are not covered, the insurance company typically will send a reservation of rights letter to the insured stating what claims the insurance company believes are covered and what claims it believes are not covered. In this case, we examine whether, under South Carolina law, such a reservation of rights letter automatically triggers a conflict of interest entitling the insured to reject counsel tendered by the insurance company and instead to choose and retain its own counsel and to have the insurance company pay for that counsel.

South Carolina law does not address this issue. The district court (predicting South Carolina law) concluded that a reservation of rights letter contesting coverage of certain claims but not other claims does not automatically trigger a conflict of interest entitling the insured to choose its own counsel and have the insurance company pay counsel fees. *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 336 F. Supp. 2d 610, 621 (D.S.C. 2004). Because we agree with the district court's conclusion, we affirm.

I.

In June 2000, Joyce Anglin sued Ben Arnold-Sunbelt Beverage Company of South Carolina, L.P. ("Ben Arnold"), Ben Arnold's Pres-

ident and Chief Executive Officer ("CEO") William Tovell, and Ben Arnold's former President and CEO Harvey Belson. Ben Arnold is a wholesale beverage distributor in South Carolina. In July 2000, Ellen White sued these same parties as well as Sunbelt Beverage Company, L.L.C. ("Sunbelt"), Ben Arnold's parent company (referred to collectively as "appellants" or "defendants"). Both cases involved South Carolina tort claims based primarily on Belson's alleged sexual harassment of Anglin and White while employed by Ben Arnold. Specifically, Anglin asserted claims against (1) Belson for intentional infliction of emotional distress, false imprisonment, assault and battery, civil conspiracy, and defamation, (2) Tovell for intentional infliction of emotional distress and civil conspiracy, and (3) Ben Arnold for intentional infliction of emotional distress, negligence, false imprisonment, defamation, negligent hiring, retention, and supervision, and wrongful discharge. JA 340-41. White made similar claims against Belson, Ben Arnold, and Sunbelt. JA 341-42.

Ben Arnold purchased general commercial liability policies from Twin City Fire Insurance Company ("Twin City") and from Hartford Casualty Insurance Company ("Hartford Casualty") (collectively "insurance companies" or "appellees"). *See* JA 44. The policies covered claims for "personal injury" up to $1 million. JA 354. Under the terms of the policies, "personal injury" was defined to include claims for defamation and false imprisonment. Claims for defamation and false imprisonment were alleged in both the *Anglin* and *White* actions. The policies, however, did not cover the remaining claims in *Anglin* or *White*. *Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 613.

Ben Arnold had consulted outside counsel concerning the allegations involving Anglin and White fourteen months before Anglin and White filed suit. *See* JA 463-65, 470-72. Only after Anglin and White filed suit did Ben Arnold notify the insurance companies of the *Anglin* and *White* actions. JA 390.

Around October 12, 2000, the insurance companies orally informed Ben Arnold that they would assume responsibility for defending all defendants and all claims in both actions. JA 342. On December 19, 2000, the insurance companies confirmed in writing that they would undertake the defense, but added that they were doing so under a reservation of rights, and informed Ben Arnold that Robert McKenzie,

an attorney in private practice in Columbia, South Carolina, had been retained to represent the defendants in these actions. JA 351-60. The insurance companies' letter included a reservation of rights and explained that the insurance companies believed that the defamation and false imprisonment claims were covered under the policies, but that the other claims were not. *Id.* Nevertheless, the insurance companies agreed to pay McKenzie to defend the defendants against all claims alleged in both cases. *Id.*

On January 19, 2001, Ben Arnold informed the insurance companies that the defendants believed there was a conflict of interest inherent in the reservation of rights and that this conflict entitled the defendants to select their own counsel and to have the insurance companies pay the legal bills. JA 396-97. The defendants proceeded with counsel whom they had previously hired. On February 20, 2001, the insurance companies sent a proposal to the defendants that McKenzie and counsel selected by Ben Arnold share control of the litigation. JA 400-01. On May 4, 2001, the defendants rejected this proposal. JA 402. Thus, McKenzie never represented any of the defendants, and the defendants excluded the insurance companies and McKenzie from the *White* and *Anglin* litigation.

The *White* action settled in June 2002 for $315,000 (JA 453), and the *Anglin* action settled in September 2002 for $515,000 (JA 189). According to the insurance companies, the defendants also incurred legal fees of $1.4 million. Appellees' Br. 29.

In December 2001, the insurance companies filed a declaratory judgment action seeking a declaration that they had no duty to indemnify the defendants in either action for various reasons, including that they were absolved of any duty to defend or indemnify because the defendants breached their contractual duty to cooperate and because the insurance companies suffered material prejudice from that breach. Defendants counterclaimed and sought a declaratory judgment that the insurance companies had a duty to defend and to indemnify in both cases. Essentially, the defendants contended that the insurance companies had to pay the legal bills and the cost of the settlement. Each side moved for summary judgment.

On May 25, 2004, the district court granted the insurance companies' motion for summary judgment concerning the claims for

defense costs and indemnification by defendants Ben Arnold, Sunbelt, and Tovell. *Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 612. As to Belson's claims for defense costs and indemnification, the court rejected Belson's indemnification claim. However, the court concluded that Belson was entitled to have the insurance companies pay for a separate defense attorney and that a trial was necessary to determine the reasonableness of Belson's attorney fees. *Id.* Thereafter, the parties settled the dispute about the amount of Belson's attorney fees. JA 306.

The defendants filed a timely notice of appeal. JA 338. We have jurisdiction under 28 U.S.C. 1291.

## II.

We review a district court's grant of summary judgment *de novo*. *See Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). We have jurisdiction based on diversity, and South Carolina law governs. Accordingly, as to the disputed legal issue, we must determine how the Supreme Court of South Carolina would rule. *Id.* If the Supreme Court of South Carolina "has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue." *Id.* In making that prediction, we may consider lower court opinions in South Carolina, the teachings of treatises, and "the practices of other states." *Wade v. Danek Med., Inc.*, 182 F.3d 281, 286 (4th Cir. 1999).

## III.

The district court declared that the "principal question in this case is whether the Supreme Court of South Carolina would adopt a per se disqualification rule that would entitle an insured to select independent counsel at its insurer's expense any time the insurer attempts to defend a lawsuit under a reservation of rights." *Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 612. The district court concluded that "South Carolina would reject a per se disqualification rule because it rests upon the presumption that whenever a lawyer is confronted with a potential conflict of interest, the lawyer will always compromise the interests of the client." *Id.* at 613. In reaching this conclusion, the dis-

trict court noted that the Supreme Court of South Carolina had not directly addressed the principal legal question in this case. *Id.* at 612.

On appeal, the appellants contend that *Hegler v. Gulf Insurance Co.*, 243 S.E.2d 443 (S.C. 1978), controls this case. In *Hegler*, the court stated: "There is no material difference in legal effect between an outright refusal to defend and in undertaking the defense under a reservation of rights . . . ." *Hegler*, 243 S.E.2d at 444. In *Hegler*, the insurance company defended the insured in the underlying suit with a reservation of rights and simultaneously filed suit against the insured and sought declaratory judgment on whether coverage existed. *Id.* at 444. The insurance company did not pay the insured's legal fees in the declaratory judgment action, and the insured prevailed in that litigation and sought attorney fees. The court analyzed whether the insured who prevailed in the declaratory judgment could recoup from the insurance company the attorney fees that the insured expended in successfully litigating the coverage question. *Id.* In the sentence cited by Ben Arnold, the court was explaining that forcing the insured to hire counsel to litigate against the insurance company in the declaratory judgment action concerning coverage was functionally equivalent to refusing to pay for the insured's defense in the underlying action. *Id.* Hence, the insured was entitled to the attorney fees arising from the insured's successful defense in the declaratory judgment action. *Id.* Because in *Hegler* the insurer did defend the insured in the underlying action, *Hegler* is not helpful (much less controlling) on the issue presented in this case.

Appellants also cite *Ollie's Seafood Grille & Bar, LLC v. Selective Insurance Co. of South Carolina*, No. 01-CP-07-1994 (C.P. 14th Jud. Cir. Nov. 27, 2002), as evidence that the Supreme Court of South Carolina would hold that when an insurance company issues a reservation of rights letter, a per se disqualification rule applies, and the insured may hire counsel of its own choosing and require the insurance company to pay the legal bills. In *Ollie's Seafood*, a South Carolina state trial court confronted "whether [the plaintiff-insured] is entitled to conduct its own defense in the underlying personal injury action through counsel it selects and controls at the expense of [the insurance company]." *Ollie's Seafood*, No. 01-CP-07-1994, Order at 1-2; JA 1070-71. The trial court expressly adopted *San Diego Navy Federal Credit Union v. Cumis Insurance Society, Inc.*, 208 Cal. Rptr.

494 (Cal. Ct. App. 1984), in which the California Court of Appeals held that where "multiple theories of recovery are alleged and some theories involve uncovered conduct under the policy, a conflict of interest exists." *Cumis Ins. Soc'y, Inc.*, 208 Cal. Rptr. at 501. When such a conflict exists, "the insurer must pay for such defense conducted by independent counsel." *Id.* at 501-02.

*Ollie's Seafood* is not helpful because the parties in *Ollie's Seafood* did not contest that "the issuance of the reservation of rights gave rise to a conflict of interest" between the insured and the insurance company, and the defense counsel appointed by the insurance company expressly acknowledged the conflict. *Ollie's Seafood*, No. 01-CP-07-1994, Order at 3; JA at 1072. In contrast, the insurance companies in this case vigorously dispute that a conflict of interest existed precluding McKenzie from representing the defendants. Because the conflict was simply assumed in *Ollie's Seafood*, the case provides no guidance as to how the Supreme Court of South Carolina would rule on the issue presented here.

Moreover, a federal court sitting in diversity is not bound by a state trial court's decision on matters of state law. In *King v. Order of United Commercial Travelers of America*, 333 U.S. 153 (1948), the Supreme Court upheld the Fourth Circuit's refusal to follow an opinion issued by a state trial court in a South Carolina insurance case. The Court concluded, "a Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its decisions should be taken as authoritative expositions of that State's 'law.'" *Id.* at 161. Accordingly, we reject appellants' reliance on *Ollie's Seafood*.

IV.

Because South Carolina law does not address whether an insured is entitled to select its own counsel at its insurance company's expense any time that the insurance company issues a reservation of rights letter concerning coverage, we look to other sources, including decisions in other states, for guidance as to how the Supreme Court of South Carolina would rule on this issue. *Wade*, 182 F.3d at 286. Not surprisingly, the parties cite competing lines of authority in support of their respective positions.

Several courts have adopted a per se rule that where an insurance company reserves the right to deny coverage for a particular claim, then a conflict of interest between the insurance company and insured exists. These cases include: *CHI of Alaska, Inc. v. Employers Reins. Corp.*, 844 P.2d 1113, 1118 (Alaska 1993); *Union Ins. Co. v. Knife Co., Inc.*, 902 F. Supp. 877, 880 (W.D. Ark. 1995) (predicting Arkansas law); *Kroll & Tract v. Paris & Paris*, 86 Cal. Rptr. 2d 78, 82 (Cal. Ct. App. 1999)(citing Cal. Civ. Code § 2860); *Nandorf, Inc. v. CNA Ins. Cos.*, 479 N.E.2d 988, 994 (Ill. App. Ct. 1985)(finding conflict when punitive damages not covered by policy); *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522, 539 (Mass. 2003); *Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 625 (8th Cir. 1981)(predicting Missouri law); *Moeller v. Am. Guar. & Liab. Ins. Co.*, 707 So. 2d 1062, 1069 (Miss. 1996); *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 120 (5th Cir. 1983) (applying Texas law).

These courts conclude that where an insurance company defends its insured under a reservation of rights concerning coverage, a conflict exists. These courts have identified the following conflicts: if an insurance company contends that a particular loss will not be covered under the policy, the lawyer hired by the insurance company may offer only a token defense of the potentially non-covered claim or conduct the defense in such a manner as to make the likelihood of the plaintiff's verdict greater on the non-covered claim. Additionally, the lawyer hired by the insurance company might gain access to confidential information during the defense that the lawyer might provide to the insurance company to contest coverage. Further, the lawyer retained to defend the insured might tend to favor the insurance company over the insured due to a desire to receive future legal work from the insurance company.

In contrast, many other courts have held that defending an insured with a reservation of rights concerning coverage does not create a per se conflict. The following cases reject a per se rule: *L & S Roofing Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 521 So. 2d 1298, 1304 (Ala. 1987); *Travelers Indem. Co. of Ill. v. Royal Oak Enter., Inc.*, 344 F. Supp. 2d 1358, 1374 (M.D. Fla. 2004) (predicting Florida law); *Armstrong Cleaners, Inc. v. Erie Ins. Exch.*, 364 F. Supp. 2d 797, 816 (S.D. Ind. 2005) (applying Indiana law); *Trinity Universal Ins. Co. v. Stevens Forestry Serv., Inc.*, 335 F.3d 353, 356 (5th Cir.

2003) (applying Louisiana law); *Finley v. Home Ins. Co.*, 975 P.2d 1145, 1150-55 (Haw. 1998); *Cent. Mich. Bd. of Trs. v. Employers Reins. Corp.*, 117 F. Supp. 2d 627, 634-35 (E.D. Mich. 2000) (applying Michigan law); *Fed. Ins. Co. v. X-Rite, Inc.*, 748 F. Supp. 1223, 1229 (W.D. Mich. 1990)(same); *Driggs Corp. v. Pa. Mfrs. Ass'n Ins. Co.*, 3 F. Supp. 2d 657, 659 (D. Md. 1998)(applying Maryland law); *Nisson v. Am. Home Assur. Co.*, 917 P.2d 488, 490 (Okla. Civ. App. 1996); *HK Sys., Inc. v. Admiral Ins. Co.*, No. 03 C 0795, 2005 WL 1563340, at *8-10 (E.D. Wis. June 27, 2005)(applying Wisconsin law); *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1137-38 (Wash. 1986)(holding that potential conflict created by reservation of rights mandates enhanced obligations of good faith for attorneys whose fees are covered by insurer). In rejecting a per se rule, these courts hold that not every reservation of rights creates a conflict. Instead a case-by-case assessment must be made.

Regardless of whether a court applies a per se conflict rule, once a court does find that a conflict of interest exists, it must determine how to remedy the conflict. Courts universally require that the insured receive counsel, but are divided into three camps over who should control the selection of counsel. Some courts hold that if a conflict exists, the insured has the right to select its own counsel to be paid for by the insurance company. *See*, *e.g.*, *CHI of Alaska*, 844 P.2d at 1118-19; *Knife Co.*, 902 F. Supp. at 881; *Kroll*, 86 Cal. Rptr. 2d at 82; *Am. Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 831-32 (11th Cir. 1989)(applying Georgia law and holding that insurer must pay for co-counsel selected by insured); *Nandorf*, 479 N.E.2d at 992; *Armstrong Cleaners*, 364 F. Supp. 2d at 817; *Herbert A. Sullivan, Inc.*, 788 N.E.2d at 539; *Moeller*, 707 So. 2d at 1069; *Rhodes*, 719 F.2d at 120-21.

At least one court has held that the insurance company has the right to provide counsel or to allow the insured to choose counsel. In either case, the insurance company pays the legal bills. *HK Sys.*, 2005 WL 1563340, at *16.

Other courts hold that an insurance company retains the right to select counsel on the insured's behalf or acknowledge the insured's right to counsel without specifying who is entitled to make the selection. *Finley*, 975 P.2d at 1151-52; *Patrons Mut. Ins. Ass'n v. Harmon*,

732 P.2d 741, 745 (Kan. 1987); *Employers Reins. Corp.*, 117 F. Supp. 2d at 634-35; *Howard*, 649 F.2d at 625; *Am. Emp. Ins. Co. v. Crawford*, 533 P.2d 1203, 1208-09 (N.M. 1975); *Nisson*, 917 P.2d at 490; *Consol. Rail Corp. v. Hartford Accident and Indem. Co.*, 676 F. Supp. 82, 86 (E.D. Pa. 1987)(predicting Pennsylvania law); *Chatterton v. Walker*, 938 P.2d 255, 262 (Utah 1997).

After reviewing these cases, we agree with the district court and reject the notion that the reservation of rights letter issued in this case creates a per se conflict that must be remedied through the insured selecting counsel and having the insurance companies pay the legal fees. More importantly, we agree with the district court's conclusion that the Supreme Court of South Carolina would so hold. *See Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 621-22. Specifically, we find the analysis and holding of *X-Rite* particularly persuasive and the facts remarkably similar:

> When Federal [Insurance] received notice of the action against X-Rite, it proceeded in accordance with black letter Michigan law by undertaking the defense with reservation of rights. Further, Federal tendered the representation of "independent counsel," the Vandeveer, Garzia firm. X-Rite objected not because it believed Vandeveer, Garzia was not "independent," but because it questioned the qualifications of attorney William Heaphy of Vandeveer, Garzia to competently defend the wrongful discharge and anti-trust claims, and because it believed the conflict created by Federal's reservation of rights gave it the absolute right to retain counsel of its choice at Federal's expense. Ultimately, X-Rite did not pursue its question regarding attorney Heaphy's qualifications. X-Rite essentially ignored his proposed substitution as counsel, and proceeded in litigation with Varnum, Riddering as counsel. X-Rite thus acted upon a questionable interpretation of Michigan law without first having ascertained whether representation by Vandeveer Garzia would involve a substantial likelihood of prejudice to its interests.

*X-Rite*, 748 F. Supp. at 1228 (footnote omitted); *see also Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 621-22.

As in *X-Rite*, the defendants in this case proceeded under the same questionable interpretation of South Carolina law. The insurance companies, in contrast, adhered to settled principles under South Carolina law regarding their right and duty to defend by providing counsel (i.e., Robert McKenzie) to represent the defendants for all claims filed against them, despite the reservation of rights. *See, e.g., Allstate Ins. Co. v. Wilson*, 193 S.E.2d 527, 530 (S.C. 1972)(holding that insurance company, operating under a reservation of rights, "had the right and the duty to control the defense until such time as it was determined that it had no liability insurance coverage"); *Allstate Ins. Co. v. Best*, 728 F. Supp. 1263, 1269 n.3 (D.S.C. 1990)(stating that insurance company "retains the ability under South Carolina law to defend the underlying personal injury action under a reservation of rights").

In rejecting the argument that receiving a reservation of rights letter per se allowed the insured to hire counsel of its choosing with the insurance company footing the bill, the court in *X-Rite* explained:

> Public policy requires the insurer to act with the utmost good faith. As long as this standard is observed, the Court may not interfere with the terms of the parties' agreement. To hold that the insurer who, under reservation of rights, participates in selection of counsel, automatically breaches its duty of good faith is to indulge the conclusive presumption that counsel is unable to fully represent its client, the insured, without consciously or unconsciously compromising the insured's interests. The Court is unable to conclude that Michigan law professes so little confidence in the integrity of the bar of this state.

*X-Rite*, 748 F. Supp. at 1229 (footnote omitted).

We are equally unable to conclude that the Supreme Court of South Carolina would profess so little confidence in the integrity of the members of the South Carolina Bar. Rigorous ethical standards govern South Carolina attorneys. Rule 1.8(f) of the South Carolina Rules of Professional Conduct mandates that a lawyer cannot accept compensation for representing a client from a third party unless certain conditions are met, including that the lawyer's judgment must remain

independent. Rule 407, SCACR.[1] Rule 5.4(c) states: "A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." *Id.* As part of exercising the lawyer's professional judgment, an attorney in South Carolina who represents an insured owes the insured a duty of loyalty and cannot, for example, communicate information detrimental to the insured to the insurance company. *See* Rule 1.8(b), Rule 407, SCACR; Rule 1.6, Rule 407, SCACR (general confidentiality rule). As Rule 7 of the South Carolina Rules for Lawyer Disciplinary Enforcement explains, a violation of these rules could lead to sanctions such as suspension, public reprimand, or disbarment. Rule 413, SCACR.[2] These possibilities, coupled with the threat of bad faith actions or malpractice actions if a lawyer violates these rules, provide strong external incentives for attorneys to comply with their ethical obligations. *Cf. Smith v. Haynsworth, Marion, McKay & Geurard*, 472 S.E.2d 612, 614 (S.C. 1996) (holding that although violation of Rules of Professional Conduct does not constitute negligence per se, such violations may be relevant and admissible in assessing the legal duty of an attorney in a malpractice action and whether that duty was breached).[3]

Of course, an insured must consent to the counsel assigned by the insurance company. *See* Rule 1.8(f)(1), Rule 407, SCACR. If the insured does not consent to counsel selected by the insurance company, the insured may refuse the defense and pay for its own defense. Stated differently, "having refused the contractual terms of the policy,

---

[1]The South Carolina Rules of Professional Conduct are codified under Rule 407 of the South Carolina Appellate Court Rules.

[2]The South Carolina Rules for Lawyer Disciplinary Enforcement are codified under Rule 413 of the South Carolina Appellate Court Rules.

[3]The conclusion that the mere possibility of a conflict does not automatically trigger the right of the insured to select counsel of its own choosing is also supported by treatises dealing with legal ethics. *See*, *e.g.*, 3 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 29.21, at 911 (2005 ed.) ("Theoretical conflicts often are present. The possibility of a conflict occurring, however, does not entitle the insured to select counsel and control the defense.").

the insured foregoes its right to compensation for defense fees." *Finley*, 975 P.2d at 1155.

Because we conclude that the reservation of rights letter in this case does not create a per se conflict of interest mandating that the insured be allowed to choose its own counsel and have the insurance companies pay the legal bills, we turn to the facts of the case to determine if an actual conflict arose. The record reflects that the defendants ousted the insurance companies from their defense long before any hypothetical conflict crystalized into an actual one warranting the insured's selection of counsel at the insurers' expense. Indeed, Ben Arnold consulted outside counsel fourteen months before White and Anglin filed suit and failed to notify the insurance companies about the *White* and *Anglin* matters until after the suits were filed. *See* JA 463-65, 470-72. Further, the defendants' failure to cooperate included not permitting the counsel appointed by the insurance companies to appear or participate in the *White* or *Anglin* actions.

The district court cogently explained how the insurance companies and all of the defendants did not have a conflict of interest at the outset and instead "shared the common interest of proving that Belson had not engaged in sexual harassment." *Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 620. The female employees' claims in *White* and *Anglin* both "(covered and non-covered) turned largely on who was telling the truth in a 'he said, she said' swearing contest. If Belson was telling the truth and no sexual harassment had occurred, then Ben Arnold would prevail on all claims (covered and non-covered). If the female employee was telling the truth and Belson had sexually harassed her, the fact that some claims were covered and some were not covered would not have divided the defense." *Id.* at 620-21 (citations and footnotes omitted).

In this case, the defendants breached the contractual duties owed to the insurance companies, which mandate that the insurance companies had both the right and duty to defend any suit seeking damages covered by the insurance contracts and that the insured had a corresponding duty to cooperate with the insurance companies in the defense and settlement of any claim. JA 378-89. Accordingly, after effecting such a breach of their contractual duties, the defendants (other than Belson with whom we deal later) cannot now successfully

claim they are entitled to reimbursement for the legal fees and settlement costs arising from the *White* and *Anglin* actions.

Defendants cite *Evans v. American Home Assurance Co.*, 166 S.E.2d 811 (S.C. 1969), for the proposition that it is "settled law with us that a liability insurer may successfully defend upon the ground that the insured has violated the cooperation clause of the policy only when the breach has been material and has resulted in substantial prejudice to the insurer." *Evans*, 166 S.E.2d at 813. In *Evans*, the insured allegedly refused to participate in his defense, as conducted by an attorney that his insurance company retained. We question, however, whether *Evans* applies to the opposite situation where the insured attempts to conduct its own defense while refusing to cooperate with the insurance company. Assuming that *Evans* applies, the insured's failure to cooperate in *Evans* was ambiguous and the court held that the insurance company had not met its burden of proving that he had refused to cooperate. *Id.* at 813-14. By contrast, in this case, the defendants' failure to cooperate with the insurance companies could not have been more stark. Finally, cases such as *Evans* do not address, let alone control, those instances, such as here, where in addition to violating the duty to cooperate, the insured also interfered with the insurance companies' right to conduct a defense.

## V.

Defendants also claim that the insurance companies are estopped from arguing that the defendants breached the insurance policies because the insurance companies attempted to appoint unqualified counsel to represent them and failed to adequately investigate or inform defendants of McKenzie's legal experience. Under South Carolina law, the elements of equitable estoppel are:

> [A]s to the party estopped [ ]: (1) conduct by the party estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the true facts. As to the party claiming the estoppel, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to

the facts in question; and (2) reliance upon the conduct of
the party estopped.

*Ingram v. Kasey's Assocs.*, 531 S.E.2d 287, 292 n.2 (S.C. 2000).

We reject the estoppel argument for an obvious reason: Robert
McKenzie, the lawyer selected by the insurance companies to repre-
sent the defendants in the *White* and *Anglin* actions, was eminently
qualified to handle those cases and the insurance companies so
informed the defendants. As the district court stated, McKenzie has
been practicing law in Columbia, South Carolina since 1966, he is a
Diplomate with the American Board of Trial Advocates, a Fellow of
the American College of Trial Lawyers, a member of the John Belton
O'Neal Inn of Court, and chairs the South Carolina Supreme Court
Commission on Continuing Legal Education. He also has served as
a member of the South Carolina Bar House of Delegates, and is a
member of the Defense Research Institute. *Twin City*, 336 F. Supp.
2d at 623. "A South Carolina lawyer, with McKenzie's credentials,
experienced in trying cases before South Carolina juries, was per-
fectly competent to handle all of these claims." *Id.* As such, the insur-
ance companies' conduct was in no way deceitful, and we reject the
estoppel argument.

VI.

Defendants also contest the district court's holding that Belson was
not entitled to indemnification for settlement funds because of his
refusal to cooperate. They argue that this conclusion contradicts the
district court's holding that Belson was entitled to counsel of his own
choosing to be paid for by the insurance companies and, as such, is
entitled to reimbursement of his reasonable legal fees. Appellants' Br.
47-52 (discussing *Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 625-26).

We disagree. The district court recognized that, at the outset of the
*White* and *Anglin* litigation, Belson and the other defendants had
divergent interests. If Belson and the other defendants lost the "he
said/she said" argument about Belson's conduct, the other defendants
had an alternative argument unavailable to Belson: Belson's conduct
was outside the course and scope of his employment; therefore, the
other defendants should not be liable. *See*, *e.g.*, *Frazier v. Badger*,

603 S.E.2d 587, 591 (S.C. 2004) (holding that assistant principal could not use an immunity defense because his sexual advances and ensuing retaliatory conduct towards a teacher were outside the scope of his official duties of employment); *Doe v. S.C. State Budget and Control Bd.*, 523 S.E.2d 457, 458 (S.C. 1999) (police officer's coerced sexual acts with women whom he pulled for traffic stops were not within the scope of his official duties, and therefore the acts were not covered under the state's general tort liability policy). In addition, if Belson was found to be acting outside the course and scope of his employment, he would have no coverage under the policy. JA 383. Though the "case-by-case" conflict analysis was not done at the outset of the *White* and *Anglin* matters, McKenzie's inability to represent *all* defendants was self-evident. The insurance companies, however, never tendered counsel separate from McKenzie for Belson. This obvious conflict between Belson and the other defendants explains why the district court properly concluded that Belson was entitled to counsel separate from the other defendants and entitled to have the insurance companies pay the reasonable legal fees of that separate counsel. *See Twin City Fire Ins. Co.*, 336 F. Supp. 2d at 625-26; *see also Nisson*, 917 P.2d at 490-91.

As for Belson's indemnification claim, Belson's separate representation does not address, must less obviate, Belson's duties under the insurance policies to cooperate and to not make any payments without the insurance companies' consent. *See* JA 384-85 (Sections IV, 2c & 2d). The record demonstrates that Belson and the other defendants ousted the insurance companies from the *White* and *Anglin* cases, refused to cooperate with the companies throughout the litigation, and negotiated and paid a settlement without the insurance companies' consent. As such, Belson breached his duty to cooperate under the policies. Accordingly, the district court properly rejected Belson's claim for indemnification.

VII.

For the reasons stated above, the district court's judgment is affirmed.

*AFFIRMED*